[Cite as *State v. Jamii*, 2023-Ohio-4671.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

     Plaintiff-Appellee,                   :

                                       No. 21AP-330

v.                                                       :              (C.P.C. No. 21CR-173)

Ashshaheed A. Jamii,                        :                    (REGULAR CALENDAR)

     Defendant-Appellant.            :

---

D E C I S I O N

Rendered on December 21, 2023

---

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee. **Argued:** *Sheryl L. Prichard*.

**On brief:** *Yeura R. Venters*, Public Defender, and *George M. Schumann*, for appellant. **Argued:** *George M. Schumann*.

---

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, Ashshaheed A. Jamii, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which he was found guilty of one count of aggravated robbery, one count of felony aggravated murder, two counts of murder, and two counts of felony murder. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} On January 13, 2021, appellant was indicted on one count of aggravated robbery in violation of R.C. 2911.01 (Count 1), one count of felony aggravated murder in violation of R.C. 2903.01 (Count 2), one count of murder in violation of R.C. 2903.02(A) (Count 3), and one count of felony murder in violation of R.C. 2903.02(B) (Count 4) arising

from the January 6, 2021 robbery and death of Malik S. Amar.  In the same indictment, appellant was charged with one count of murder in violation of R.C. 2903.02(A) (Count 5), and one count of felony murder in violation R.C. 2903.02(B) (Count 6) arising from the January 6, 2021 death of David W. Knox.  All counts, except the aggravated robbery count, included three-year firearm specifications under R.C. 2941.145.

{¶ 3}  The matter came for trial before a jury in May 2021.  Plaintiff-appellee, State of Ohio, presented the following evidence.

{¶ 4}  Fourteen-year-old J.W. testified that on the evening of January 5, 2021, Amar drove her to visit her friend, Z.C., who was living with appellant.  Appellant was the only person in the apartment when J.W. and Amar arrived.  J.W. initially sat in a back bedroom talking to a friend on her cell phone while she waited for Z.C. to arrive.  Amar eventually asked J.W. to join him and appellant in the living room.  During a conversation between appellant, Amar and J.W., appellant touched J.W.'s upper thigh, "[c]lose to [her] personal area."  (May 18, 2021 Tr. Vol. I at 43.)  Amar grabbed J.W.'s face and told her it was inappropriate for a grown man to touch her in that way.  Appellant accused Amar of calling him a rapist; Amar denied that was his intent. Thereafter, appellant and Amar left the apartment for 20-30 minutes.  While they were gone, J.W. sent her friend a text message at 10:26 p.m. that said, "[Z.C.'s] stepdad [appellant] grabbed my leg."  (Tr. Vol. I at 46.) When Amar and appellant returned, Amar told J.W. he had discussed the touching incident with appellant and that everything was now fine.

{¶ 5}  A short time later, Amar told J.W. he and appellant were leaving the apartment and that she should accompany them.  J.W. initially protested, but after Amar raised his voice, she agreed to go.  The three left in Amar's car.  Amar first drove to an ATM and then to the apartment of his girlfriend, Shavonne Baker. While appellant, Amar, and Baker conversed, J.W. excused herself and went into the bathroom.  She called her best friend, told her she did not feel safe because she thought something was about to happen, and directed her to call police if she did not receive a text message or call from her in the next 15 minutes.  Shortly after J.W. returned from the bathroom, appellant, unprovoked, took out a gun and pulled back the slide.  Baker became upset and ordered everyone to leave.

**{¶ 6}** Appellant, Amar, and J.W. left Baker's apartment and returned to Amar's car. Amar told appellant he needed to "chill out." (Tr. Vol. I at 53.) Appellant responded that he was "messed up in the head right now" and had "a lot going on." (Tr. Vol. I at 54.) J.W. then asked Amar when they would be going back to appellant's apartment; Amar stated he had to make a couple stops before returning. Amar then drove to an apartment complex on 5th Avenue; he went inside one of the apartments while J.W. and appellant remained in the car. Appellant told J.W. he previously lived in the area, knew it was dangerous, and would call a Lyft to take J.W. home. Appellant also stated, "I know what's up. I'm not dumb," and "[t]hey think I'm stupid." (Tr. Vol. I at 55.)

**{¶ 7}** Amar returned to the car 10-15 minutes later accompanied by a man (later identified as Knox) whom J.W. did not know. Amar told appellant Knox was unable to drive and asked appellant if he could drive Amar's car back to appellant's apartment. After appellant agreed to do so, Amar stated he and Knox would follow in Knox's car. J.W. moved from the back seat to the front passenger seat. Appellant began driving erratically, swerving in and out of traffic, which scared J.W. J.W. noticed appellant's gun sitting on the car's console. Appellant called someone on his cell phone and asked that person to forgive him. Appellant passed the phone to J.W.; an unidentified woman asked J.W. what was going on and why appellant was talking about forgiveness. J.W. told the woman she was Z.C.'s friend and that she did not know what was happening.

**{¶ 8}** Soon thereafter, appellant parked Amar's car; Amar pulled Knox's car nearby. J.W. noticed appellant's gun was missing from the console area. Appellant opened his car door carrying the gun; Amar exited Knox's car with his hands up. Appellant pointed the gun at Amar, stated "Pow, N word," and shot him. (Tr. Vol. I at 62.) J.W. exited the car and ran away; she then heard another gunshot. She initially hid behind an abandoned car. Concluding that her hiding place was not safe because appellant was armed and she was not, she continued running and eventually hid in some bushes. She observed appellant "looking around" while driving in circles around the area; he eventually drove away. J.W. then flagged down a car, reported to the driver that her friend's stepfather had just killed two people, and asked the driver to take her home. Upon arriving at home, she told her father what happened, and he called police. She identified appellant as the shooter from a photograph provided by police.

{¶ 9}   On cross-examination, J.W. averred that she observed Amar drinking alcohol at appellant's apartment, but never saw him use cocaine.  She further testified she initially "didn't think anything of it" when appellant touched her thigh; however, after Amar scolded appellant for doing so, tensions rose between the two men.  J.W. further asserted that Amar "[got] loud" when she said she did not want to leave appellant's apartment.  (Tr. Vol. I at 82.)  She further averred that Amar and appellant met with a man (Knox) at the ATM that J.W. did not know.  She also stated that she, Baker, Amar, and appellant were the only persons present in Baker's apartment; Knox was not there.  According to J.W., Knox was quite intoxicated when he left the 5th Avenue apartment, which presumably was the reason Knox could not drive his car.  After driving very fast and erratically, appellant pulled into a random driveway on Fairwood Avenue and turned off the car.  Amar pulled Knox's car close to where appellant had parked.  Appellant exited the driver's door with his gun drawn.  Amar walked toward appellant with his hands up.  J.W. did not hear appellant warn Amar not to come near him.

{¶ 10}   On redirect examination, J.W. testified that Amar did not have a gun in his hand when he exited Knox's vehicle.  She also averred that appellant's erratic driving after leaving the 5th Avenue apartment complex was not because they were being chased.  She reiterated that appellant was the only person with a gun at Baker's apartment.  On recross-examination, J.W. testified that Amar gave appellant the keys to his car before entering the 5th Avenue apartment.

{¶ 11}   Baker testified that at the time of the events at issue, Amar was her boyfriend; she knew appellant but did not know J.W.  On January 5, 2021, she and Amar had dinner at her apartment.  Amar later received a phone call and left to meet someone.  At the time, Baker did not know who Amar was going to meet; however, she later learned that Amar was meeting Knox to provide cocaine to him.  Amar returned later that evening with appellant and J.W.; Knox was not with them.  Amar told Baker about appellant touching J.W.'s upper thigh and asked Baker if J.W. could stay with her while he took appellant elsewhere.  Baker refused and told them all to leave.  Before leaving, J.W. went into the bathroom; appellant sat on the couch.  According to Baker, appellant's "attitude and demeanor [were] totally off" and "[h]is eyes were bloodshot red."  (Tr. Vol. I at 125.)  Baker again directed the three visitors to leave; appellant produced a gun and pulled the slide back, which caused a bullet

to eject from the chamber onto the floor. Amar told appellant to put the gun away and left with appellant and J.W. Amar returned to the apartment briefly, but left after he and Baker argued about appellant's actions. Amar again left with appellant and J.W. in Amar's car. Baker later learned that appellant had shot and killed Amar. Subsequently, Baker was interviewed by the police; she told them what had happened at her apartment, provided them with the bullet that had been ejected from appellant's gun, and identified appellant from a photograph provided by police. Baker testified that although Amar sometimes told people he carried a gun, he did not own a gun, did not have a gun that evening, and did not threaten appellant.

{¶ 12} On cross-examination, Baker admitted she called 911 because Amar was unruly, belligerent, and drunk. She also testified that while she did not personally know Knox, she was aware that Amar sometimes picked up cocaine and provided it to Knox for his personal use.

{¶ 13} Columbus Division of Police ("CPD") Officer Jeffrey Lazar testified that he arrived at the crime scene at approximately 1:30 a.m. on January 6, 2021. Officer Lazar observed a running vehicle with the gearshift in drive located near a curb in front of a residence on Fairwood Avenue. The front passenger door was open; a man with a fatal gunshot wound to the head lay on the driveway near the vehicle. A second man with a fatal gunshot wound to the head was seated in the driver's seat; the man had a liquor bottle between his legs and a baggie of cocaine in his left hand. Officer Lazar's body-worn camera captured the crime scene; the video was played for the jury.

{¶ 14} Detective Mark Burghart of the Crime Scene Search Unit ("CSSU") testified he and other CSSU personnel took photographs and collected evidence from the crime scene. Detective Burghart identified CSSU photographs depicting the vehicle, the bodies of Amar and Knox,[1] two spent shell casings, a black knit cap, appellant's cell phone, a bottle of vodka, a baggie of cocaine, and a bloody paper. Detective Burghart also identified evidence collected from the scene, including the items depicted in the photographs.

---

[1] State's exhibits A24-28 depict Knox's body as it was when CSSU arrived at the scene—slumped over in the driver's seat of the vehicle. State's exhibits A43-47 show Knox's body after he was removed from the vehicle and positioned on the street by the coroner.

{¶ 15} SWAT Officer Mark Dilello testified he was dispatched to an address on East Long Street to search for a vehicle reportedly stolen following a homicide. Officer Dilello located the vehicle, which was unoccupied, in the parking lot of an apartment complex at the Long Street address. Officer Dilello's body-worn camera captured the scene; the video was played for the jury. Following an inventory search, the vehicle was impounded.

{¶ 16} CSSU Detective Nicole Prysock testified that pursuant to a search warrant, she photographed and collected evidence from the vehicles recovered from Fairwood Avenue and East Long Street. Detective Prysock took DNA swabs and recovered a live round of ammunition from the vehicle recovered from East Long Street.

{¶ 17} The parties stipulated that the Montgomery County coroner would testify Amar died from a gunshot wound to the head and that a Franklin County deputy coroner would testify that Knox also died from a gunshot wound to the head. The parties further stipulated that a forensic scientist from the CPD Crime Lab would testify appellant was a contributor to a DNA mixture recovered from the gear shift of the vehicle found on East Long Street.

{¶ 18} Detective Lowell Titus, the lead investigator in the case, testified that CSSU personnel recovered no weapons during the search of the crime scene or the subsequent processing of the vehicles pursuant to impoundment. Testing of the two shell casings recovered from the scene revealed both were fired from the same gun. Detective Titus further testified that during his interview with J.W., she provided details about the events preceding and including the shooting of Amar and Knox, including identification of appellant as the shooter. Detective Titus acknowledged that during J.W.'s initial interview with a patrol officer she was less than forthright about the details of the events preceding the shooting because that interview was conducted in the presence of her father and she did not want him to know about her relationship with Z.C. Detective Titus also interviewed Baker, who confirmed that appellant, Amar, and J.W. were at her apartment prior to the shooting; Baker also provided the bullet she found in her apartment and identified a photograph of appellant as the person who ejected the bullet from his gun.

{¶ 19} Detective Titus further testified that once appellant was established as a suspect in the murders, he filed a warrant for his arrest. Further investigation revealed that the vehicle found on East Long Street was registered to Amar and that appellant's driver's

license listed his address on East Long Street. Detective Titus further testified that following appellant's arrest, he obtained oral DNA swabs from appellant.

{¶ 20} On cross-examination, Detective Titus averred that CPD issued the warrant for appellant's arrest on January 7, 2021; appellant voluntarily surrendered to the Franklin County Jail on January 8, 2021. He acknowledged there were inconsistencies in J.W.'s initial police interviews as to the events preceding the shootings and that she did not admit she provided a false narrative in those interviews until her final police interview in April 2021. Detective Titus further acknowledged CPD's investigation revealed that both Amar and Knox had ingested cocaine, no evidence established appellant knew Knox or that he or J.W. were aware Amar planned to go to Baker's apartment or to Knox's 5th Avenue apartment, and that after leaving Knox's apartment, Amar provided appellant the keys to his car and asked him to drive it. Finally, Detective Titus acknowledged that Amar had $400 on his person and Knox had 2.922 grams of cocaine in his hand at the time of their deaths.

{¶ 21} Caleb Worley, a CPD forensic firearms analyst, testified he compared the two shell casings recovered from the crime scene to each other and the two bullets recovered from the bodies of Amar and Knox to each other. Based on those comparisons, Worley concluded the two shell casings had been fired from the same gun and the two bullets had been fired from the same gun. However, without access to the gun, Worley could not determine whether the casings and bullets were fired from the same gun.

{¶ 22} Following the state's presentation of evidence, appellant moved for judgment of acquittal, pursuant to Crim.R. 29, on the basis that the state failed to sustain its burden of proof that appellant did not shoot Amar and Knox in self-defense. The trial court denied appellant's motion.

{¶ 23} After the state rested its case, appellant presented two witnesses on his behalf —his mother, Alfrida Turner—and himself. Turner testified she resided on East Long Street. She received a phone call from appellant just after midnight on January 6, 2021. During the call, appellant spoke in a calm voice; however, Turner could not understand what he was saying. Turner also spoke to J.W., who only stated she did not know what was happening. On cross-examination, Turner indicated that the entire phone call lasted approximately one minute.

{¶ 24} Appellant testified that after returning home from work on January 5, 2021, he drank a couple beers. At the time, Z.C. was living with him because Z.C.'s mother had kicked him out of her home and he needed somewhere to live. Appellant described his relationship with Z.C. as "like a stepson," as appellant shared a child with Z.C.'s mother. (Tr. Vol. II at 327.) Z.C. told appellant that his cousin, Amar, was bringing Z.C.'s girlfriend, J.W., to the apartment for a visit. Appellant knew Amar and J.W. through Z.C. and his mother; he and Amar were "cool" with each other. (Tr. Vol. II at 330.) Appellant directed Z.C. to go to the store and buy food for his guests.

{¶ 25} Amar and J.W. arrived at appellant's apartment after Z.C. left for the store. Amar sat with appellant at the kitchen table; J.W. went into the bedroom. Amar used cocaine and offered it to appellant; appellant declined. Amar told J.W. to come into the kitchen and sit at the table. Amar asked appellant to pay him the money Z.C. owed him; appellant refused to do so. According to appellant, Amar was drunk and belligerent during this conversation. J.W. was nervous and upset by the interaction between appellant and Amar; in an effort to console J.W., appellant touched her hand, which was on her knee. When J.W. pulled her hand away, appellant inadvertently touched her knee.

{¶ 26} Amar accused appellant of touching J.W.'s leg inappropriately. Both J.W. and appellant denied Amar's accusation. Amar eventually conceded he was mistaken about the touching incident. Thereafter, Amar told appellant he had lost his ATM card; he asked appellant if he could transfer money into appellant's bank account and then appellant could withdraw that money from an ATM and give it to Amar. Appellant agreed to this arrangement. Amar insisted that J.W. accompany them to the ATM. Because he lived in a high crime area, appellant brought his gun with him for protection.

{¶ 27} Appellant withdrew the money from the ATM and gave it to Amar. At that point, Knox pulled up next to Amar's vehicle. Amar exited his vehicle and entered Knox's vehicle. Appellant overheard Amar tell Knox about the leg-touching incident with J.W. Knox leaned forward, glared at appellant, and then leaned back in his seat; Knox's actions made appellant uneasy. Amar came back to his car and then drove to Baker's apartment. Upon arrival, appellant went into the bathroom. He overheard Amar tell Baker about the leg-touching incident with J.W., which Amar described to Baker as being sexual in nature. After appellant exited the bathroom, Amar tried to get appellant to admit that he had

touched J.W. inappropriately. Amar walked toward appellant; appellant drew his gun, pulled back the slide, and told Amar to "chill out." (Tr. Vol. II at 345.) Appellant drew his gun because Amar had been drinking, using cocaine, and behaving erratically. According to appellant, he "didn't know what [Amar] was capable of doing at that point." (Tr. Vol. II at 345.) Amar tried unsuccessfully to take the gun from appellant. Although Amar indicated he had a gun, he did not produce one. Baker was upset about the confrontation and ordered appellant, Amar, and J.W. to leave.

{¶ 28} The three left Baker's apartment in Amar's car. At that point, appellant assumed Amar would drive him and J.W. back to appellant's apartment. Instead, Amar drove to an apartment complex on 5th Avenue. Upon arrival, Amar parked the car, took the car keys with him, and went inside one of the apartments. Appellant called for a Lyft to take him home; he wanted to get out of the area because Amar had been acting strangely throughout the evening. Appellant particularly noted Amar's actions in driving to an unknown location after promising to take appellant home and leaving appellant alone in the car with J.W. after accusing him of touching her inappropriately.

{¶ 29} A short time later, Amar emerged from the apartment with Knox. At that point, appellant cancelled the Lyft. Knox walked to his car; Amar walked over to appellant, gave appellant his car keys, and directed him to drive his car. Appellant initially protested, but after Amar pushed him toward the car and again ordered him to drive, appellant acquiesced. Amar told appellant he was not concerned that appellant had a gun because he had a gun and Knox kept an AR rifle in his car. Appellant believed Amar's assertions about the guns. Appellant thought something "fishy [was] going on" because Amar told appellant that Knox was too drunk to drive; however, Knox entered the driver's seat of his car while Amar sat in the passenger seat. Amar informed appellant that he and Knox would follow him back to appellant's apartment; after dropping off J.W., the three men would leave together in Knox's car.

{¶ 30} Appellant began driving erratically in order to evade Amar and Knox. Because he believed something bad was going to happen to him, he called his mother, and, in accordance with the tenets of his religion, asked her forgiveness for past sins he had committed against her. Appellant then gave J.W. his cell phone and told her to tell his mother what was happening. Thereafter, believing he had successfully eluded Amar and

Knox, appellant pulled the car into a random driveway and shut off the lights and engine. Immediately thereafter, Knox pulled his car next to the curb close to the driveway. While the car was still moving, Amar jumped out of the front passenger seat, left the door open, and ran toward appellant. Appellant exited Amar's vehicle with his gun drawn and repeatedly warned Amar not to approach him. When appellant turned away to retrieve his phone from J.W., Amar ran toward appellant with his right hand by his side and his left hand extended. When appellant turned around, Amar stated "Nah, fuck that" and attempted to take appellant's gun. (Tr. Vol. II at 363.) Recalling Amar's assertion that both he and Knox were armed, appellant shot Amar in self-defense.

{¶ 31} After shooting Amar, appellant approached Knox's vehicle; he realized Knox could shoot him through the open passenger door. When he saw Knox appear to reach for something under the seat, appellant told him to "[f]reeze" and "[s]lowly show me your hands." (Tr. Vol. II at 369.) After Knox "raise[d] up real fast," appellant shot him because he feared Knox was going to shoot him. (Tr. Vol. II at 369.)

{¶ 32} Appellant denied that Amar exited his vehicle with his hands up. Appellant tried to escape from Amar and Knox before shooting them; he shot both men because Amar had repeatedly warned him that they were armed. When he discovered a warrant had been issued for his arrest, he immediately surrendered to police.

{¶ 33} On cross-examination, appellant admitted he never saw Amar with a gun at any point during the events at issue. He further acknowledged he was still sitting in the car with the keys when Amar exited Knox's vehicle and could have driven away. He also admitted he left the keys in the car when he exited it to confront Amar and could have driven away after he shot Amar. Appellant further conceded that after shooting Amar and Knox, he did not call 911; instead, still armed, he fled the scene in Amar's car and later threw his gun in a trash can behind his mother's house; he threw the gun away because he did not want to be caught with it. He also admitted he did not surrender to police until he discovered a warrant had been issued for his arrest. Appellant asserted he was afraid Amar and Knox were planning to murder him because Amar believed appellant had touched J.W. inappropriately.

{¶ 34} On redirect examination, appellant averred he did not have sufficient time to exit the driveway before Amar approached him. He further asserted he did not leave after

he shot Amar because Knox was still in his car and appellant had been told by Amar that both he and Knox were armed. Appellant further testified that he fled the scene after shooting Amar and Knox because he panicked.

{¶ 35} On recross-examination, appellant reiterated that he never observed Amar or Knox with a gun. He acknowledged that Knox was facing forward in the car and was not looking at him when he shot him in the right ear.

{¶ 36} At the close of all the evidence, appellant renewed his Crim.R. 29 motion. The trial court again denied the motion.

{¶ 37} Following deliberations, the jury returned guilty verdicts on all counts and firearm specifications.

{¶ 38} In a sentencing entry filed June 17, 2021, the trial court merged Counts 3 and 4 with Count 2 and merged Count 6 with Count 5. The court imposed an indefinite sentence of 8-12 years on Count 1; a life sentence with parole eligibility after 33 years (including 3 years for the firearm specification) on Count 2; and a life sentence with parole eligibility after 18 years (including 3 years for the firearm specification) on Count 5. The trial court ordered the sentences to run consecutively for a total aggregate sentence of life with parole eligibility after a minimum of 59 years and a maximum of 63 years. Appellant was awarded 161 days of jail-time credit.

{¶ 39} Appellant timely appealed and the matter was fully briefed by the parties. In his briefing, appellant alleged four assignments of error, the fourth asserting a facial constitutional challenge to the indeterminate sentencing scheme under R.C. 2967.271, the Reagan Tokes Act, imposed by the trial court on Count 1. On July 22, 2022, this court sua sponte stayed the appeal pending the Supreme Court of Ohio's resolution of *State v. Hacker*, No. 2020-1496, and *State v. Simmons*, No. 2021-0532. On July 26, 2023, the Ohio Supreme Court issued its decision in *Hacker* and *Simmons*, finding the Reagan Tokes Act to be constitutional. *State v. Hacker*, ___Ohio St.3d ___, 2023-Ohio-2535. On August 28, 2023, appellant filed a motion to lift the stay and reactivate the appeal; appellant also filed a notice of voluntary dismissal of his fourth assignment of error. On August 29, 2023, this court granted appellant's motion to lift the stay and reactive the appeal. As appellant has voluntarily dismissed his fourth assignment of error, this decision will focus on the remaining three assignments of error set forth below.

## II. Assignments of Error

{¶ 40} Appellant assigns the following three assignments of error for our review:

> [I.] The verdicts of guilty as to count one, aggravated robbery, and count two, felony-aggravated murder, based on aggravated robbery, and court four, felony-murder, based on aggravated robbery, are not supported by sufficient evidence.
>
> [II.] The verdicts of guilt as to count one, aggravated robbery, and count two, felony-aggravated murder, based on aggravated robbery, and count four, felony-murder, based on aggravated robbery, are against the manifest weight of the evidence.
>
> [III.] The verdicts of guilt as to count three and count five, murder, and as to count four and count six, felony-murder, based on felonious assault, are against the manifest weight of the evidence.

## III. Analysis

{¶ 41} Appellant's first and second assignments of error are interrelated and will be considered together. Under these assignments of error, appellant challenges the sufficiency and weight of the evidence supporting his convictions on Count 1, aggravated robbery, Count 2, felony aggravated murder, and Count 4, felony murder.

{¶ 42} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus. Accordingly, we separately set forth the relevant standards of review.

{¶ 43} "[W]hether the evidence is sufficient as a matter of law to support a conviction involves a determination of whether the state met its burden of production at trial." *State v. Harris*, 10th Dist. No. 21AP-678, 2023-Ohio-3994, ¶ 14, citing *State v. Smith*, 10th Dist. No. 03AP-1157, 2004-Ohio-4786, ¶ 16; *State v. Frazier*, 10th Dist. No. 05AP-1323, 2007-Ohio-11, ¶ 7; *Thompkins* at 386. In a sufficiency challenge, an appellate court does not weigh the evidence; rather, the court determines " ' "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." ' " *Harris* at ¶ 14, quoting *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. A reviewing court

"essentially assume[s] the state's witnesses testified truthfully and determine[s] if that testimony and any other evidence presented at trial satisfies each element of the crime." *Harris* at ¶ 14, citing *State v. Watkins*, 10th Dist. No. 16AP-142, 2016-Ohio-8272, ¶ 31, citing *State v. Hill*, 10th Dist. No. 07AP-889, 2008-Ohio-4257, ¶ 41. Thus, evidence is sufficient to support a conviction where, if believed, that evidence would permit any rational trier of fact to conclude that the state proved each element of the offense beyond a reasonable doubt. *Harris* at ¶ 14, citing *Frazier* at ¶ 7, citing *Jenks* at paragraph two of the syllabus.

{¶ 44} "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Thompkins* at 386, citing *State v. Robinson*, 162 Ohio St. 486 (1955). "[A] conviction based on legally insufficient evidence constitutes a denial of due process." *Id.*, citing *Tibbs v. Florida*, 457 U.S. 31, 45 (1982), citing *Jackson v. Virginia*, 443 U.S. 307 (1979). "To reverse a judgment of a trial court on the basis that the judgment is not sustained by sufficient evidence, only a concurring majority of a panel of a court of appeals reviewing the judgment is necessary." *Thompkins* at paragraph three of the syllabus, applying Article IV, Section 3(B)(3) of the Ohio Constitution.

{¶ 45} In contrast to a sufficiency challenge, a manifest weight claim "attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion." *Harris* at ¶ 15, citing *State v. Richey*, 10th Dist. No. 17AP-260, 2018-Ohio-3498, ¶ 50, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 11-13, citing *Thompkins* at 386-87. Although the evidence may be sufficient to sustain a guilty verdict, a manifest weight challenge requires a different type of analysis. *Harris* at ¶ 14, citing *State v. Walker*, 10th Dist. No. 02AP-679, 2003-Ohio-986, ¶ 43. The weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other. *Id.* at ¶ 15, citing *State v. Petty*, 10th Dist. No. 15AP-950, 2017-Ohio-1062, ¶ 60, citing *State v. Boone*, 10th Dist. No. 14AP-87, 2015-Ohio-2648, ¶ 49, citing *Thompkins* at 387.

{¶ 46} In considering a manifest weight claim, an appellate court sits as a " 'thirteenth juror' " and may disagree " 'with the factfinder's resolution of the conflicting testimony.' " *Id.* at ¶ 16, quoting *Thompkins* at 387, citing *Tibbs* at 42. In making this determination, an appellate court " 'review[s] the entire record, weighs the evidence and all

reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 47} Although an appellate court reviews credibility when assessing the manifest weight of the evidence, the court must be mindful that determinations regarding witness testimony and the weight of testimony are primarily for the trier of fact. *Harris* at ¶ 17, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. This is so because the trier of fact is best able " 'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Harris* at ¶ 17, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). A conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of the events over the appellant's. *State v. Gale*, 10th Dist. No. 05AP-708, 2006-Ohio-1523, ¶ 19. The trier of fact is free to believe or disbelieve all or any of the testimony provided at trial. *State v Jackson*, 10th Dist. No. 01AP-973 (Mar. 19, 2002).

{¶ 48} " 'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175. Further, reversal of a jury verdict on manifest weight grounds requires unanimous concurrence of all three judges on the court of appeals panel reviewing the case. *Harris* at ¶ 18, citing Article IV, Section 3(B)(3) of the Ohio Constitution; *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, ¶ 2-4, citing *Thompkins* at paragraph four of the syllabus.

{¶ 49} Appellant first contends there was insufficient evidence to permit a rational trier of fact to find the essential elements of aggravated robbery under Count 1 of the indictment. That count charged appellant with aggravated robbery of Amar in violation of R.C. 2911.01(A)(1) and/or (3).

{¶ 50} R.C. 2911.01(A) states in part:

> No person, in attempting or committing a theft offense as defined in [R.C. 2913.01] or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

\*\*\*

(3) Inflict, or attempt to inflict, serious physical harm on another.

{¶ 51} R.C. 2913.01(K) defines "[t]heft offense" to include a violation of R.C. 2913.02.  Relevant here, R.C. 2913.02(A)(1) and (2) state in part:

No person, with purpose to deprive the owner of property * * * shall knowingly obtain or exert control over * * * the property * * *:

(1) Without the consent of the owner * * *; [or]

(2) Beyond the scope of the express or implied consent of the owner * * *[.]

{¶ 52} In challenging his conviction for aggravated robbery, appellant first contends there was insufficient evidence to prove he committed a theft offense under either R.C. 2913.02(A)(1) or (2) prior to killing Amar.  Appellant maintains that when Amar left Knox's apartment building, he gave appellant the keys to his car and told him to drive it back to appellant's apartment while he and Knox followed in Knox's car.  Appellant maintains that Amar's open-ended entrustment of his car to him does not support a finding that appellant exerted control over Amar's car without his consent or beyond the scope of Amar's consent prior to Amar's murder.

{¶ 53} Although appellant arguably may have had Amar's initial consent to drive his car prior to the shooting, appellant clearly acted outside the scope of that consent when he drove away in Amar's car after shooting and killing him.  The state's theory of the case was that appellant committed aggravated robbery by stealing Amar's car after shooting him. The state expressed this theory in its opening statement: "We only have the one aggravated robbery count and that only applies to Malik Amar because after [appellant] shot Malik Amar in the head, he stole his vehicle; that's your theft offense." (Tr. Vol. I at 21.)  The state reiterated this theory in its closing argument: "Count One is Aggravated Robbery. * * * What we're talking about is when the Defendant shot and killed [Amar] and then shot and

killed [Knox], but it's the shooting of [Amar] and then taking his car. That's all we're talking about here. Okay? He didn't have permission from a dead man to take his car, okay, aggravated robbery. * * * The murder was first, leading up to the theft." (Tr. Vol. III at 507.)

{¶ 54} " ' "Once a person lawfully has control over property with consent, that person cannot thereafter exert control for a different purpose. That person already has control. Instead, what changes is whether or not the individual [acted] within the scope of the consent." ' " (Emphasis omitted.) *State v. Woodburn*, 4th Dist. No. 18CA891, 2019-Ohio-2757, ¶ 24, quoting *State v. Roberts*, 2d Dist. No. 26431, 2015-Ohio-2716, ¶ 13, quoting *State v. Dortch*, 2d Dist. No. 17700 (Oct. 15, 1999). " ' "If the individual begins to use the property for something outside what the owner specifically authorized, the individual has gone beyond the owner's consent. The [theft] statute allows for this precise situation in R.C. 2913.02(A)(2)." ' " *Id.*, quoting *Roberts* at ¶ 13, quoting *Dortch*.

{¶ 55} In the present case, the state presented sufficient evidence to prove appellant committed a theft offense by exerting control over Amar's car beyond the scope of the consent provided by Amar. As noted above, J.W. testified that Amar gave appellant the keys to his car and told him to drive it back to appellant's apartment. Thus, the scope of consent provided by Amar was limited to appellant driving the car back to his apartment. J.W. further testified that after appellant shot Amar, he returned to Amar's car, drove it around the area for several minutes and then drove away. Appellant's flight from the scene in Amar's car after shooting him clearly exceeded the scope of consent provided by Amar.

{¶ 56} Appellant next argues the state did not present sufficient evidence to prove he used a deadly weapon or inflicted serious physical harm in committing the theft offense. We have already determined that appellant committed a theft offense when he fled the scene in Amar's car after shooting and killing him. Appellant's argument essentially goes to the issue of whether a criminal defendant "killed before he stole or stole before he killed." *State v. Palmer*, 80 Ohio St.3d 543, 571 (1997). The *Palmer* court found that issue to be "of no consequence." *Id.* " 'The victim of a robbery, killed just prior to the robber's carrying off her property, is nonetheless the victim of an aggravated robbery. The victim need not be alive at the time of asportation.' " *Id.* at 571-72, quoting *State v. Smith*, 61 Ohio St.3d 284, 290 (1991). *See also State v. Twyford*, 94 Ohio St.3d 340, 354 (2002) ("This court has

consistently rejected arguments that no robbery occurred because the murder victim was already dead at the time of the theft.").

{¶ 57} Construing the evidence most strongly in favor of the state, there was sufficient evidence upon which a trier of fact could find that appellant used a deadly weapon in committing a theft offense and/or that he inflicted serious physical harm while committing a theft offense. Accordingly, we find no merit to appellant's sufficiency challenge to his conviction for aggravated robbery under R.C. 2911.01(A)(1) and/or (3).

{¶ 58} Appellant next contends there was insufficient evidence to permit a rational trier of fact to find the essential elements of aggravated felony murder under Count 2 of the indictment. That count charged appellant with purposely causing Amar's death while committing aggravated robbery. R.C. 2903.01(B) states in part: "No person shall purposely cause the death of another * * * while committing * * * aggravated robbery."

{¶ 59} Similar to his sufficiency challenge to his conviction for aggravated robbery, appellant argues the evidence was insufficient to support a conviction for felony aggravated murder because it only arguably showed a theft offense occurring after Amar's death. Appellant maintains that a theft offense committed after a homicide does not meet the requirement set forth in R.C. 2903.01(B) that the homicide must occur "while" an aggravated robbery is being committed. Ohio law does not support appellant's position.

{¶ 60} The Supreme Court has held " 'the term "while" does not indicate * * * that the killing must occur at the same instant as the [predicate felony], or that the killing must have been caused by the [felony].' " *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, ¶ 55, quoting *State v. Cooper*, 52 Ohio St.2d 163, 179-80 (1977). Nor does the law require "that the felony must have been the motive for the killing." *Id.*, citing *State v. Williams*, 74 Ohio St.3d 569, 577 (1996). "Rather, 'while' means that 'the killing must be directly associated with the [felony] as part of one continuous occurrence.' " *Id.* at ¶ 56, quoting *Cooper* at 179-80. Thus, " 'the term "while" means that the death must occur as part of acts leading up to, or occurring during, or immediately subsequent to the [relevant felony].' " *Id.*, quoting *Williams* at 577. " 'The sequence of events' may be 'examined in light of time, place, and causal connection' to determine whether it 'amounts to "one continuous occurrence." ' " *Id.*, quoting *State v. McNeill*, 83 Ohio St.3d 438, 441 (1998), quoting *State v. Cooey*, 46 Ohio St.3d 20, 23 (1989).

{¶ 61} We have previously noted the evidence in support of his conviction for the predicate felony of aggravated robbery. Similarly, with respect to felony aggravated murder, the state presented sufficient evidence, which, if believed, established that appellant intended to, and did, kill Amar, and then left the scene in Amar's car. The state's evidence established appellant parked Amar's car on a random residential driveway, exited the car, and shot and killed Amar as he stood on the driveway. After killing Amar, appellant returned to Amar's car and drove away from the scene. When viewed " 'in light of time, place, and causal connection,' " the situs and timing of the murder and asportation of Amar's car connected the offenses such that the jury reasonably could have found that the aggravated murder " 'occur[red] as part of acts leading up to' " the aggravated robbery. *Johnson* at ¶ 56 quoting *McNeill* at 441; *Johnson* at ¶ 56, quoting *Williams* at 557.

{¶ 62} Construing the evidence most strongly in favor of the state, there was sufficient evidence upon which a trier of fact could find appellant purposely caused Amar's death while committing aggravated robbery. Accordingly, we find no merit to appellant's sufficiency challenge to his conviction for felony aggravated murder under R.C. 2903.01(B).

{¶ 63} Lastly, appellant contends there was insufficient evidence to permit a rational trier of fact to find the essential elements of felony murder under Count 4 of the indictment. That count charged appellant with causing Amar's death as a proximate result of committing aggravated robbery and/or felonious assault.

{¶ 64} R.C. 2903.02(B) states in part: "No person shall cause the death of another as a proximate result of the offender's committing * * * an offense of violence that is a felony of the first or second degree." Both aggravated robbery and felonious assault are offenses of violence. R.C. 2901.11(C)(9). Aggravated robbery is a felony of the first degree. R.C. 2901.11(C). As pertinent here, felonious assault is a felony of the second degree. R.C. 2903.11(A)(2); 2903.11(D)(1).

{¶ 65} Appellant cites *State v. Gibson*, 8th Dist. No. 98725, 2013-Ohio-4372, ¶ 36 for the proposition that " 'for criminal conduct to constitute the "proximate cause" of a result, the conduct must have (1) caused the result, in that but for the conduct the result would not have occurred, and (2) the result must have been foreseeable.' " (Appellant's Brief at 37-38, quoting *Gibson*.) Appellant contends the predicate felony offense at issue is aggravated robbery and that such "was not a 'but for' cause of [Amar's] death. The 'cause'

cannot come after the 'effect.' An intent to commit theft formed after the death cannot be the cause of the death. Further, death could not be the foreseeable result of a theft that had not yet occurred." (Appellant's Brief at 38.)

{¶ 66} We decline to comment on appellant's general "proximate cause" proposition, other than to note that appellant's application of that proposition focuses exclusively on aggravated robbery. Appellant does not acknowledge that the state charged appellant with felony murder based on aggravated robbery and/or felonious assault as alternative predicate felonies.

{¶ 67} Here, the jury instructions set forth aggravated robbery and/or felonious assault as alternative predicate felonies under Count 4. Thus, the jury could have determined the relevant predicate felony offense to be felonious assault rather than aggravated robbery. The felonious assault statute, R.C. 2903.11(A)(2), prohibits a person from "knowingly" "[c]aus[ing] or attempting to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." The term "[d]eadly weapon" is defined as "any instrument, device, or thing capable of inflicting death, and designed or specifically adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A). A "[f]irearm" is a "deadly weapon." R.C. 2923.11(B)(1).

{¶ 68} As previously mentioned, the state provided eyewitness testimony from J.W. establishing that appellant shot and killed Amar in the driveway of a random residence. In addition to that eyewitness testimony, the state presented evidence establishing that responding police officers discovered Amar's lifeless body on the driveway. The state also presented evidence from the coroner who examined Amar's body establishing that Amar's death was caused by a gunshot wound to the head. The state's evidence further established that a shell casing was recovered from the area near Amar's body and the bullet that struck Amar was recovered from his body.

{¶ 69} When viewed in a light most favorable to the state, we find there was sufficient evidence to convict appellant of felony murder via felonious assault, as the evidence sufficiently established appellant caused physical harm to Amar by shooting him with a deadly weapon and that the shooting was the proximate cause of Amar's death. Accordingly, we find no merit to appellant's sufficiency challenge to his conviction for felony murder under R.C. 2903.02(B).

{¶ 70} Appellant also contends his convictions on Counts 1, 2, and 4 were against the manifest weight of the evidence. Appellant's manifest weight challenge is based on essentially the same grounds raised in his sufficiency arguments. Appellant maintains that the greater weight of the evidence establishes: (1) he did not commit aggravated robbery in the commission of a theft offense because he had Amar's consent to drive his car prior to the shooting, (2) Amar's death did not occur while an aggravated robbery was being committed, and (3) Amar's death was not the proximate result of the commission of aggravated robbery. We have considered the evidence relevant to these arguments, and, after reviewing the entire record, we cannot say that the evidence weighs heavily against appellant's convictions, that the trier of fact lost its way, or that a manifest miscarriage of justice has occurred.

{¶ 71} Based on the foregoing, we conclude the state presented sufficient evidence to support appellant's convictions on Counts 1, 2, and 4 and that those convictions were supported by the manifest weight of the evidence.

{¶ 72} Accordingly, appellant's first and second assignments of error are overruled.

{¶ 73} In his third assignment of error, appellant challenges the weight of the evidence supporting his convictions on Counts 3, 4, 5, and 6. Counts 3 and 5 charged appellant with the murders of Amar and Knox, respectively; Counts 4 and 6, respectively, charged appellant with the felony murders of Amar and Knox with the predicate offense being felonious assault.

{¶ 74} Murder is prohibited by R.C. 2903.02(A), which states that: "No person shall purposely cause the death of another." As already noted, R.C. 2903.02(B) proscribes murder based on an underlying offense of violence that is a felony of the first- or second-degree (here, felonious assault). Appellant does not dispute that he purposely shot both Amar and Knox and that the gunshots caused their deaths. However, at trial, appellant testified that events preceding the shootings established that he shot and killed Amar and Knox in self-defense. Based on appellant's testimony, the trial court instructed the jury on self-defense.

{¶ 75} The elements of self-defense in a deadly force case are that the defendant: (1) was not at fault in creating the situation giving rise to the affray, (2) had a bona fide belief that he was in imminent danger of death or great bodily harm and his only means of

escape from such danger was in the use of such force, and (3) did not violate any duty to retreat or avoid the danger.  *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, ¶ 14, citing *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002).

{¶ 76} Self-defense is an affirmative defense—not an element of a crime.  *Id*. at ¶ 24. R.C. 2901.05(B)(1) provides in part:

> A person is allowed to act in self-defense * * *.  If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense * * * the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense * * *.

{¶ 77} Thus, R.C. 2901.05(B)(1) requires the state " 'to disprove self-defense by proving beyond a reasonable doubt that [the defendant] (1) was at fault in creating the situation giving rise to the affray, OR (2) did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, OR (3) did violate a duty to retreat or avoid the danger.' " (Emphasis sic.)  *State v. Messenger*, 10th Dist. No. 19AP-879, 2021-Ohio-2411, ¶ 36, quoting *State v. Carney*, 10th Dist. No. 19AP-402, 2020-Ohio-2691, ¶ 31.  "Under [the second] prong, the defendant must have used only that force reasonably necessary to repel the attack.  That is, he must not have used excessive force." *State v. Hall*, 10th Dist. No. 21AP-137, 2023-Ohio-837, ¶ 41, citing *State v. Kean*, 10th Dist. No. 17AP-427, 2019-Ohio-1171, ¶ 58.  Although " 'the burden of *proof* for the affirmative defense of self-defense has shifted to the state, the burden of *production* for all affirmative defenses, including self-defense, remains with the defendant.' " (Emphasis sic.)  *Id*. at ¶ 38, quoting *Messenger*, 2021-Ohio-2044, at ¶ 44, citing *State v. Parrish*, 1st Dist. No. C-190379, 2020-Ohio-4807, ¶ 14.

{¶ 78} " 'A self-defense claim is generally an issue of credibility.' "  *State v. Lawrence*, 11th Dist. No. 2022-L-110, 2023-Ohio-3419, ¶ 41, quoting *State v. Olsen*, 11th Dist. No. 2022-A-0071, 2023-Ohio-2254, ¶ 57.  " 'Disputes in credibility for the purposes of evaluating self-defense are best resolved by the trier of fact.' " *Id*., quoting *State v. Bentley*, 11th Dist. No. 2022-L-076, 2023-Ohio-1792, ¶ 24.  " 'It has been held that "a conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version" and rejected the defendant's claim of self-

defense.' " *Id.*, quoting *Bentley* at ¶ 24, quoting *Messenger*, 2021-Ohio-2044, at ¶ 49. "When weighing witness testimony supporting a claim of self-defense, the trier of fact is 'free to believe or disbelieve the testimony of the witnesses' and 'is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible.' " *Id.*, quoting *Bentley* at ¶ 24, citing *State v. Haney*, 11th Dist. No. 2012-L-098, 2013-Ohio-2823, ¶ 43.

{¶ 79} Appellant does not separately address each of the three prongs of a self-defense claim. Rather, appellant provides the following general narrative, which, we note, is based on his version of events. Amar acted belligerently toward him over the entire course of the evening based on his belief that appellant had touched J.W. inappropriately. While at Baker's apartment, Amar became so belligerent about the touching incident that appellant feared for his safety and brandished a firearm as a warning to Amar. Appellant believed Amar's assertion that he and Knox were armed, and he told J.W. that he believed Amar and Knox meant to harm him. Amar's and Knox's pursuit of him while he tried to elude them caused him to call his mother because he thought his life was in danger. After he pulled Amar's vehicle into the driveway, Amar approached him and aggressively attempted to take appellant's gun despite appellant's warning to stay back. When Knox reached for something under the seat of his vehicle, appellant ordered him to freeze; Knox did not heed appellant's warning. From this narrative, we glean appellant's arguments to be that he was not at fault in creating the situation leading to the deaths of Amar and Knox and that he had a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape.

{¶ 80} The state separately addresses each element of a self-defense claim. The state first argues that appellant was at fault in creating the situation giving rise to the deaths of Amar and Knox. In support, the state cites J.W.'s testimony that after appellant pulled Amar's vehicle into the driveway, he exited it with his gun drawn. Amar exited Knox's vehicle, unarmed, with his hands up. When Amar walked toward appellant, appellant stated "Pow, N word" and shot him. As to Knox, the state cites appellant's own testimony that Knox was seated in his car, facing forward, when appellant shot him in the side of the head. The state further references appellant's testimony that he never observed either Amar or Knox display a gun.

{¶ 81} The state next argues appellant did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape. In support, the state cites J.W.'s testimony that Amar did not have a gun in his hand when he approached appellant on the driveway as well as appellant's testimony that he never saw Amar or Knox display a weapon. The state further notes the testimony of CPD personnel that no weapons were recovered from the area near Amar's body or from Knox's car. The state also cites appellant's testimony that Knox was seated in his vehicle when appellant shot him.

{¶ 82} Lastly, the state argues appellant violated his duty to retreat and avoid any danger. In support of this argument, the state observes that after leaving Knox's apartment complex in Amar's car, appellant chose to stop in a random driveway rather than call for help or drive to a safe location. The state further notes appellant's testimony that he was still seated in Amar's vehicle when Amar exited Knox's vehicle and could have driven away at that point; however, he chose to exit Amar's car and confront Amar with his gun drawn.

{¶ 83} The state also argues that appellant's own testimony contradicts his assertions that he was fearful of Amar over the entire course of the evening preceding the shootings. Specifically, the state cites appellant's admissions that he voluntarily rode with Amar to the ATM, to Baker's residence and to Knox's apartment, cancelled his Lyft ride, and agreed to drive Amar's vehicle for him after leaving Knox's apartment.

{¶ 84} In addition to the arguments and evidence cited by the state in its brief, we also note that appellant's actions after the shootings tend to discredit his testimony. Appellant drove Amar's car away from the scene, destroyed evidence by throwing his gun in a trash can, and did not call police immediately to report that he had shot two men in self-defense.

{¶ 85} Having reviewed the entire record, weighed the evidence and all reasonable inferences, and considered the credibility of witnesses, we conclude the jury did not lose its way and create a manifest miscarriage of justice in finding that the state, beyond a reasonable doubt, disproved that appellant was not at fault in creating the situation leading to the shooting deaths of Amar and Knox, that appellant had a bona fide belief he was in great bodily harm necessitating the use of deadly force, and that appellant did not violate the duty to retreat or avoid the danger. Accordingly, the manifest weight of the evidence

supported appellant's convictions for murder and felony murder with respect to both Amar and Knox.

**{¶ 86}** Appellant's third assignment of error is overruled.

## IV. Conclusion

**{¶ 87}** Having overruled appellant's three assignments of error, and appellant having voluntarily dismissed his fourth assignment of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BEATTY BLUNT, P.J., and MENTEL, J., concur.

————————————