[Cite as *State v. Cumberlander*, 2024-Ohio-2431.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 23AP-90 |
| v. | : | (C.P.C. No. 18CR-2827) |
| Christopher Lee Cumberlander, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on June 25, 2024

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Paula M. Sawyers*, for appellee. **Argued:** *Paula M. Sawyers*.

**On brief:** *Lisa M. Tome*, for appellant. **Argued:** *Lisa M. Tome*.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, Christopher Lee Cumberlander, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas, pursuant to a jury verdict, finding him guilty of one count of felonious assault with firearm specification. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} On June 13, 2018, appellant was indicted on one count of felonious assault in violation of R.C. 2903.11, a second-degree felony, with a three-year firearm specification, one count of improperly handling firearms in a motor vehicle ("improper handling") in violation of R.C. 2923.16, a fourth-degree felony, and one count of having weapons while

under disability ("WUD") in violation of R.C. 2923.13, a third-degree felony.  The charges arose from the shooting of Keyon Edwards.

{¶ 3}   Appellant elected to waive his right to a jury trial and be tried by the court on the improper handling and WUD counts.  Following a bench trial, the trial court found appellant guilty on both counts.   Thereafter, the matter proceeded to a jury trial on the felonious assault with firearm specification count.  The parties inform this court that after the jury was unable to reach a unanimous verdict, the trial court declared a mistrial.[1]

{¶ 4}   On November 14, 2022, a jury trial commenced on the felonious assault with firearm specification count.[2]   Plaintiff-appellee, State of Ohio, presented the following evidence.

{¶ 5}   Edwards testified that in summer 2018, he resided on Pine Bluff Road in Columbus, Ohio with his then-fiancée, Tamika Jenkins, Jenkins' daughter she shared with appellant, Jenkins' son, and Trinity Gills Edwards, his daughter from a previous relationship.  Edwards had known appellant for approximately three years.  He described their relationship as "up and down." (Tr. Vol. I at 42.)  He recounted a prior incident where appellant attempted to force his way into the house, resulting in a physical altercation between the two men.

{¶ 6}   On June 10, 2018, Edwards and his cousin, Benjamin Thomas, returned home from a weekend trip out of town.  Edwards and Thomas went inside the house to get Gills Edwards because they were going to drive her to a relative's home.  While Edwards was inside, Jenkins' son told Edwards that appellant was outside asking to see his daughter.

{¶ 7}   Edwards and Thomas walked outside; neither was armed.  Edwards saw appellant's car parked at the bottom of the driveway, blocking Edwards' exit.  Appellant started yelling at Edwards from the car; Edwards told him to move so he could exit his driveway.  Appellant told Edwards to bring his daughter outside; Edwards replied he would not do so because it was not appellant's day to visit her.  The argument escalated, with appellant ultimately threatening to shoot and kill Edwards if Edwards did not bring his

---

[1] Appellant asserts in the Statement of the Case portion of his brief that after the jury in the first trial was unable to reach a verdict, "[t]he trial court, by way of a criminal processing sheet declared a mistrial." (Appellant's Brief at 5.) The state accepted appellant's Statement of the Case in this regard.

[2] Following opening statements but prior to the commencement of testimony, the jury viewed the crime scene.

daughter to him. Anticipating that appellant wanted to fight him, Edwards emptied his pockets of his wallet, cellphone, and other items and placed them on his front lawn.

{¶ 8} Appellant then drove a short distance down the street. He exited his car, put his hands up to signal he wanted to fight, and told Edwards to "[c]ome down here and fight." (Tr. Vol. I at 48.) Edwards walked toward appellant; at this point, Edwards did not see a weapon in appellant's hands. When Edwards got within 25-30 feet of appellant, appellant reached into his back pocket, retrieved a gun, and immediately shot Edwards once in the upper left thigh.

{¶ 9} Realizing he had been shot and fearing appellant would shoot at him again, Edwards turned around, walked back to his house, and told Jenkins to call 911. He then retrieved a shotgun he kept inside the house. When Thomas tried to take the shotgun away from him, Edwards put it inside the living room closet. Edwards then sat outside and waited for medics to arrive; however, when the pain in his leg intensified, he decided to go to the hospital on his own. Edwards was treated and released that day.

{¶ 10} On cross-examination, Edwards conceded that during the previous incident with appellant, he punched appellant twice in the face because he was "trying to hurt him." (Tr. Vol. I at 65.) Edwards further testified that appellant and Jenkins had a "parental agreement" regarding their daughter; however, he could not recall the details of that agreement. (Tr. Vol. I at 66.) Edwards averred that prior to June 10, 2018, appellant had never picked up his daughter from the house; rather, pursuant to the agreement between appellant and Jenkins, they exchanged the child at various public locations.

{¶ 11} As to the events of June 10, 2018, Edwards testified he was "pretty sure" that Thomas owned a gun; however, Thomas did not "have anything on him that day." (Tr. Vol. I at 71.) Edwards acknowledged that during his initial encounter with appellant "things got heated," with both men yelling at each other. (Tr. Vol. I at 72.) When appellant threatened to kill him, he thought appellant was "just puffing up," so he did not take him seriously and was not afraid. (Tr. Vol. I at 75.) As to the second encounter, Edwards admitted that when appellant exited his car and urged him to fight, he could have walked inside his house and told Jenkins to call police or retrieve his discarded cell phone from the front lawn and called police himself. He conceded he did not do so because he "was upset

and ready to fight with [appellant]." (Tr. Vol. I at 76.) Edwards also conceded that appellant did not move toward him after appellant exited his car and stood in the street.

{¶ 12} When questioned about testimony he provided at a previous hearing related to the instant case, Edwards indicated he did not remember asserting that he threatened appellant. He acknowledged he had previously testified that Thomas did not own any guns; however, he now averred he was not aware that Thomas owned a gun until the incident on June 10, 2018.

{¶ 13} On redirect examination, Edwards reiterated that while appellant was seated in his car at the bottom of the driveway, he threatened to kill Edwards; specifically, appellant told Edwards "[i]f you don't get away from my car, I'm gonna shoot you. I'm gonna kill you." (Tr. Vol. I at 85.) Edwards averred he did not see appellant with a weapon when appellant was seated in his car. He also testified Thomas did not take a weapon with him on their weekend trip, did not have a weapon on him at the time of the incident, and never told Edwards he had a weapon.

{¶ 14} Thomas testified he owned several guns; but he did not take a gun with him on the weekend trip because Edwards had asked him not to bring a gun with him. When he and Edwards returned from their trip, Edwards parked in his driveway and the two began unloading the car. While Edwards was in the house, appellant pulled up and asked Thomas to bring his daughter to him because he wanted to take her to a cookout. Because Thomas did not know appellant, he told him he would have to discuss the situation with Edwards. After Thomas reported the conversation to Edwards, Edwards came outside, approached appellant as he sat in the car, and told him he could not take his daughter because it was not his day to visit her. Appellant got angry, started cursing at Edwards, and, using expletives and a derogatory racial slur, told his wife that he was "about to shoot" Edwards. (Tr. Vol. I at 98.) Based on appellant's threatening language, Thomas informed Edwards he thought appellant had a gun. Edwards told appellant he could not have his daughter and that he should leave; he did not threaten appellant.

{¶ 15} Appellant angrily "pulled off a little bit" and parked on the opposite side of the street. (Tr. Vol. I at 101.) Thomas told Edwards he believed appellant was afraid of Edwards and would try to shoot him; as such, he urged Edwards not to approach appellant. Appellant then "backed back up" to Thomas and Edwards; both appellant and Edwards

were angry and continued cursing at each other. (Tr. Vol. I at 102.) Appellant then "pulled off" again and parked in front of a house located down the street on Pine Bluff Road. (Tr. Vol. I at 102.) Appellant got out of his car and started yelling and cursing at Edwards. At this point, Thomas did not see a weapon on appellant's person. Thomas saw a woman standing on the front porch of the house where appellant was parked. Edwards told Thomas he wanted to get appellant away from the neighbor's house, so he handed Thomas his wallet and cellphone and walked toward appellant. When Edwards was approximately 20 feet from appellant, appellant pulled a gun from his pocket and shot Edwards without warning. Thomas dropped Edwards' wallet and cellphone and told appellant he was "gonna get [his] ass" for shooting Edwards; appellant responded, "[s]hut up before I kill your ass." (Tr. Vol. I at 115.) Edwards then walked back to his house and retrieved a shotgun. Before Edwards left the house, Thomas took the shotgun away because he did not want Edwards to retaliate against appellant. According to Thomas, Edwards was unarmed and never threatened to shoot appellant. After the shooting, Thomas drove Edwards to the hospital.

{¶ 16} On cross-examination, Thomas acknowledged that appellant "pulled up cool" to Edwards' house and just asked Thomas to get his daughter. (Tr. Vol. I at 116.) Thomas further acknowledged that he owned several guns and always carried one with him. He was not carrying a gun on June 10, 2018 because Edwards, who knew that Thomas owned several guns, asked him not to bring one with him on their weekend trip. Thomas conceded that in previous proceedings involving the incident at issue he had never testified that Edwards requested he not bring a gun with him. He attributed the lack of testimony to the fact that he had never been questioned about the issue. Thomas also conceded he did not call 911 after appellant shot Edwards. On redirect examination, Thomas testified he had a "clean" criminal record and was legally permitted to own a gun.

{¶ 17} Gills Edwards testified she was 14 years old on June 10, 2018. On that date, she was loading some items into Edwards' vehicle when appellant pulled up in the front of the house and requested to take his daughter with him. Edwards told appellant to leave and the two started arguing. Edwards then emptied his pockets and placed the items on the ground. Appellant exited his car and Edwards walked toward him with his hands up as if to say "[y]ou gotta go." (Tr. Vol. II at 15.) Edwards did not have a weapon and did not

threaten appellant. At this point, Gills Edwards did not see a weapon on appellant's person or clothing. However, she observed appellant's arm move as Edwards approached him. She then heard a gunshot and saw Edwards walking back to the house holding his thigh. Edwards retrieved a shotgun from the house but did not use it. Edwards, Thomas, and Gills Edwards drove to the hospital. When they arrived, police were present with guns drawn; Gills Edwards assumed the police thought they were suspects in the shooting.

{¶ 18} On cross-examination, Gills Edwards testified that Edwards was standing near the house and appellant was sitting in his car in the street when the two first started arguing; Edwards did not approach appellant's car at that time. Edwards eventually approached appellant's car; Gills Edwards then got into the back seat of Edwards' car. Because the windows were rolled up, she could not really hear what the two men were saying. She acknowledged that when interviewed by police after the incident, she reported she did not get a good look at the gun used to shoot Edwards.

{¶ 19} Kathy Garrett testified that she lived on Pine Bluff Road on June 10, 2018. Prior to that date, she had interacted with Edwards occasionally but did not know him well. On the day of the incident, Garrett was painting a glider on her front porch when she heard Edwards and another man (whom she identified at trial as appellant) arguing. Edwards was standing in his front yard; appellant was sitting in a car. After Edwards told appellant to leave, appellant drove past her house; however, he eventually backed up and parked in front of her house. Appellant then exited his car, stood in the middle of the street, and urged Edwards to come toward him. Garrett did not see a weapon on either Edwards or appellant. Edwards approached appellant; when he was less than a car length from appellant, Garrett heard a gunshot and saw that Edwards had been shot. Although she did not see a weapon in appellant's hand, she was certain appellant had fired the gunshot. She heard a man who was with Edwards say "[h]e shot my boy, he shot my boy." (Tr. Vol. II at 54.) Garrett called 911 to report the shooting. Appellant remained at the scene until police arrived.

{¶ 20} The state played Garrett's 911 call for the jury.[3] During the 911 call, Garrett reported her address as 5439 Pine Bluff Road and stated that appellant "shot again." (Tr.

---

[3] The audio recording of Garrett's 911 call is part of the record on appeal. (State's Ex. H1.) The audio recording was not transcribed.

Vol. II at 62.) At trial, she admitted she lied about her address because she was afraid to provide her real address and that she was mistaken about appellant firing more than one shot.

{¶ 21} On cross-examination, Garrett reiterated that appellant initially pulled up in front of Edwards' house and remained seated in his car. Edwards and another man walked up to appellant's car; appellant and Edwards then engaged in a heated argument. Appellant eventually parked in front of Garrett's house, got out of his car, and told Edwards to come toward him. Edwards then walked toward appellant. When he reached the trunk of appellant's car, Garrett heard the gunshot and saw Edwards fall.

{¶ 22} Todd A. Cramblett testified he was a patrol officer with the Columbus Division of Police ("CPD") on June 10, 2018.[4] On that date, he responded to a 911 call of a shooting on Pine Bluff Road. When Officer Cramblett arrived at the scene, he observed a man, later identified as appellant, standing by a parked car on the side of the street in front of a house on Pine Bluff Road. Appellant reported he had discharged a gun during a dispute and that the gun was inside his car. Officer Cramblett recovered a gun and holster from the driver's side door of the car. The victim of the shooting was not at the scene. According to Officer Cramblett, appellant was non-threatening and cooperative. On cross-examination, Officer Cramblett reiterated that appellant was cooperative, reported what had happened, and directed him to the gun inside the car.

{¶ 23} CPD Detective Richard D. Criner, Jr.[5] testified that on June 10, 2018 he was dispatched to the scene as a member of the Crime Scene Search Unit. In that capacity, he collected and documented evidence recovered from the scene. At trial, Detective Criner identified numerous photographs taken in connection with the investigation. He also identified a gun, holster, shell casing, and spent projectile recovered from the scene, CPD laboratory reports pertaining to examination of the gun, and the 911 call made by Garrett.

{¶ 24} Following the presentation of witness testimony, the state entered into the record joint stipulations establishing the gun recovered from the scene was operable, the

---

[4] Officer Cramblett testified that at the time of trial he was a detective with CPD Major Crimes Bureau. Because he was a patrol officer at the time of the events at issue here and his testimony relates to that time period, we shall refer to him as Officer Cramblett.

[5] Detective Criner testified he is now retired from CPD.

spent projectile was fired from the gun, and that the spent cartridge casing could not be eliminated as having been fired from the gun.

{¶ 25} At the conclusion of the state's case, defense counsel moved to dismiss the felonious assault charge pursuant to Crim.R. 29 contending the state did not meet its burden of proof. The trial court denied the motion without explanation.

{¶ 26} Thereafter, appellant testified as the sole witness in the defense case. Appellant stated he had known Edwards for approximately ten years. In 2017, he and Edwards had an argument which ultimately led to a physical altercation. During the fight, Edwards punched appellant several times in the face and stomped on him with his steel-toed work boots. As a result, appellant suffered an orbital fracture.

{¶ 27} Appellant further testified he and Jenkins had a previous relationship and the two shared parenting duties for their five-year-old daughter. The daughter lived with Jenkins and Edwards. He and Jenkins typically exchanged their daughter at public locations.

{¶ 28} On June 10, 2018, appellant, along with his wife and step-daughter, drove to the Edwards/Jenkins home to see his daughter. As he had done since the incident in 2017, appellant parked across the street from the house and honked the horn to signal his arrival. Jenkins' son walked over to appellant's car; appellant invited him and the rest of the family to a cookout he was hosting later that day. After the boy went inside the house, Edwards and Thomas (whom appellant did not know) came outside and walked up to appellant's car. Edwards began cursing at appellant, put his hand inside the car through the open driver's window, and told him to leave the neighborhood. Appellant noticed Thomas had a gun tucked in his waistband underneath his shirt. Thomas became agitated and suggested to Edwards that the two "shoot this car up." (Tr. Vol. II at 137.) Appellant believed Thomas' threat was real. Appellant did not respond verbally; instead, he moved his car approximately 30 feet down the street. Appellant moved his car again and told his wife to summon police to check on his daughter. He did not want to leave the area because he was concerned about his daughter being inside the house while Edwards and Thomas were exhibiting aggressive behavior.

{¶ 29} Through his rearview mirror, appellant observed Edwards and Thomas "doing something" in Edwards' front yard. (Tr. Vol. II at 143.) He then saw Thomas hand

"something" to Edwards, after which Edwards ran toward appellant's car. (Tr. Vol. II at 143.) Appellant felt "[t]hreatened" by Edwards' action and had to "think quick and do something." (Tr. Vol. II at 153.) Worried that Edwards was going to carry through with Thomas' suggestion about "shoot[ing] up the car," appellant retrieved a gun from his car; he then exited the car because he did not want his family to be shot. (Tr. Vol. II at 144-45, 153.) Appellant observed Edwards "reaching * * * [o]n his waist" for what appellant believed was a gun. (Tr. Vol. II at 146.) When Edwards got close enough to appellant, appellant pressed his gun directly against Edwards' thigh and shot him. Edwards said, "Oh, shit, you shot me." (Tr. Vol. II at 146.) Appellant responded, "No shit. If you stick around, I'm gonna shoot you some more." (Tr. Vol. II at 146.) Appellant also told Thomas, who was standing nearby, "If you come closer, I'm gonna shoot you, too." (Tr. Vol. II at 147.)

{¶ 30} After the shooting, Edwards and Thomas walked away. Appellant called 911. The defense played appellant's 911 call for the jury.[6] During the call, appellant reported Edwards approached him while he was sitting in his car and tried to assault him. Appellant can be heard telling Thomas that he was "still right here." (Def. Ex. 5.)

{¶ 31} Appellant testified that while he was on the 911 call, he saw Edwards and Thomas enter Edwards' house. Soon thereafter, he observed the two men "wrestling" with a shotgun on the front porch. (Tr. Vol. II at 151.) Eventually, Edwards and Thomas got into a car and drove away. Police arrived at the scene moments later. Appellant reported what happened and directed police to the gun inside his car.

{¶ 32} On cross-examination, appellant testified he filed a complaint against Edwards following the 2017 altercation; however, he did not know whether Edwards was ever charged. Regarding the incident on June 10, 2018, appellant acknowledged that his decision to pick up his daughter that day was not in accordance with any court-ordered visitation schedule. He also acknowledged he did not leave the neighborhood or call 911 when he first saw that Thomas had a gun and he never told police that Thomas had a gun. He conceded that neither Edwards nor Thomas shot at him. However, he stated that he "wouldn't * * * wait for that to happen." (Tr. Vol. II at 168.) He further conceded that when

---

[6] The audio recording of appellant's 911 call is part of the record on appeal. (Def. Ex. 5.) The audio recording was not transcribed.

he saw Edwards "running up on" him, he grabbed a gun from between the front seats,[7] exited his car with the gun in his hand, and immediately shot Edwards at "[p]oint blank range" while the gun was pressed against Edwards' thigh. (Tr. Vol. II at 175-77.) He acknowledged police found the gun in the driver's side door of his car.

{¶ 33} As to the 911 call, in response to the state's suggestion that he did not sound fearful when he told Thomas he was "right here," appellant explained that he was afraid prior to the time he shot Edwards; however, after he shot Edwards, he was no longer afraid because he believed Edwards and Thomas were no longer threats. (Tr. Vol. II at 167.) He further stated that telling Thomas he was "right here" was meant to caution Thomas not to further engage with him because he had a gun.

{¶ 34} On redirect examination, appellant estimated that only a "few seconds" transpired between the time he saw Edwards running toward his car and when he shot him; as such, he did not have time to issue warnings or make decisions. (Tr. Vol. II at 188.) As to the statement on the 911 call that he was "right here," appellant explained that after he shot Edwards, he still perceived Thomas to be a threat to him and his family because Edwards had returned the gun to Thomas and Thomas was "standing there with the gun making these threats." (Tr. Vol. II at 189.) Appellant's comment was intended to caution Thomas not to make any more "bad choices." (Tr. Vol. II at 190.)

{¶ 35} At the conclusion of the defense's case, defense counsel renewed the Crim.R. 29 motion without argument; the trial court summarily denied the motion.

{¶ 36} Following deliberations,[8] the jury returned a verdict of guilty on the felonious assault with firearm specification count. On January 12, 2023, the trial court conducted a sentencing hearing. The court imposed a 3-year sentence on the felonious assault count, a mandatory 3-year sentence on the accompanying firearm specification, an 18-month

---

[7] Appellant surmised that his wife dropped the gun and her cell phone between the front seats when she tried to call police.

[8] During deliberations, the jury submitted two questions. The first question asked: "What is the visitation and custody legal agreement between [appellant], Tamika, and kids?" (Tr. Vol. III at 84-85.) Without objection from either party, the trial court instructed the jury that it had already received all the evidence in the case. The second question asked: "If we the jury cannot come to an agreement what are our next steps?" (Tr. Vol. IV at 4.) At the state's request and over the objection of defense counsel, the trial court instructed the jury pursuant to *State v. Howard*, 42 Ohio St.3d 18 (1989). Approximately two hours after the trial court provided the *Howard* instruction, the jury indicated that it had reached a verdict. Appellant does not challenge the *Howard* instruction on appeal.

sentence on the improper handling count, and a 12-month sentence on the WUD count. The court ordered the sentences for felonious assault and firearm specification to run consecutively to each other and concurrently with the improper handling and WUD counts and concurrently with his conviction in an unrelated case. The trial court memorialized appellant's conviction and sentence in a judgment entry issued January 13, 2023.

## II. Assignment of Error

{¶ 37} In a timely appeal, appellant advances a single assignment of error for our review:

> APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF HIS RIGHT TO DUE PROCESS AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.

## III. Analysis

{¶ 38} In his sole assignment of error, appellant argues that his conviction for felonious assault with firearm specification is against the manifest weight of the evidence. More particularly, appellant argues the state failed to disprove beyond a reasonable doubt that he was not acting in self-defense or in defense of another when he shot Edwards.

{¶ 39} When presented with a manifest weight challenge, an appellate court sits as a "thirteenth juror" and may disagree " 'with the factfinder's resolution of the conflicting testimony.' " *State v. Harris*, 10th Dist. No. 21AP-678, 2023-Ohio-3994, ¶ 16, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). In making this determination, an appellate court " 'review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.2d 172, 175 (1st Dist.1983). " 'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175. Further, reversal of a jury verdict on manifest weight grounds requires unanimous concurrence of all three judges on the court of appeals panel reviewing the case. *Harris* at ¶ 18, citing Article IV, Section 3(B)(3) of the Ohio Constitution.

{¶ 40} Appellant was convicted of felonious assault pursuant to R.C. 2903.11(A)(2), which provides in part that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon." Appellant does not dispute the evidence in the record supports the finding that he committed felonious assault when he knowingly caused physical harm to Edwards with a deadly weapon. Instead, appellant argues the jury lost its way in concluding that he did not act in self-defense or defense of another in committing felonious assault.

{¶ 41} Historically, self-defense has been an affirmative defense, requiring an accused to prove the elements of self-defense or defense of another[9] by a preponderance of the evidence. *State v. Ferrell*, 10th Dist. No. 19AP-816, 2020-Ohio-6879, ¶ 25. However, effective March 28, 2019, the General Assembly amended R.C. 2901.05, Ohio's self-defense statute. R.C. 2901.05(B)(1) now provides in relevant part: "[a] person is allowed to act in self-defense, [or] defense of another. * * * If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense [or] defense of another, * * * the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense [or] defense of another * * * as the case may be."

{¶ 42} Thus, pursuant to R.C. 2901.05(B)(1), an accused no longer bears the burden of establishing the elements of self-defense or defense of another by a preponderance of the evidence. *Ferrell* at ¶ 26. Rather, when an accused presents evidence that tends to support that the accused used force against another in self-defense or defense of another, the state must disprove at least one of the elements of self-defense or defense of another beyond a reasonable doubt. *State v. Carney*, 10th Dist. No. 19AP-402, 2020-Ohio-2691, ¶ 31. "The state's new burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal." *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, ¶ 27.

{¶ 43} The elements of a self-defense or defense of another claim differ depending on whether the accused employed deadly or non-deadly force to defend against their perceived assailant. *State v. Stevenson*, 10th Dist. No. 17AP-512, 2018-Ohio-5140, ¶ 33.

---

[9] Defense of another requires proof of the same elements as self-defense. *State v. Moss*, 10th Dist. No. 05AP-610, 2006-Ohio-1647, ¶ 14.

There is no doubt that appellant employed deadly force, as he shot Edwards with a handgun. *See State v. Marshall*, 61 Ohio App.2d 84, 86 (10th Dist.1978) ("A gun may inflict death * * * in the manner for which it was designed by firing a bullet."); *See also State v. Dale*, 2d Dist. No. 2012 CA 20, 2013-Ohio-2229, ¶ 15 ("The use of a gun constitutes the use of deadly force."); R.C. 2901.01(A)(2) (defining "[d]eadly force" as "any force that carries a substantial risk that it will proximately result in the death of any person"). When deadly force is used, the state must disprove at least one of the following elements of a self-defense or defense of another claim: (1) the accused was not at fault in creating the situation giving rise to the affray, (2) the accused had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force, and (3) the accused did not violate any duty to retreat or avoid the danger. *Messenger* at ¶ 14, citing *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). To state it in the affirmative, when deadly force is used, the state must prove beyond a reasonable doubt that the accused " '(1) was at fault in creating the situation giving rise to the affray, OR (2) did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, OR (3) did violate a duty to retreat or avoid the danger.' " (Emphasis sic.) *State v. Jamii*, 10th Dist. No. 21AP-330, 2023-Ohio-4671, ¶ 77, quoting *Messenger* at ¶ 36, quoting *Carney* at ¶ 31.

{¶ 44} Regarding the first element of a self-defense/defense of another claim, the concept that an accused must not be at fault in creating the situation giving rising to the situation " 'is broader than simply not being the immediate aggressor.' " *State v. Bender*, 3d Dist. No. 14-23-12, 2024-Ohio-1750, ¶ 27, quoting *State v. Elam*, 12th Dist. No. CA2021-08-106, 2022-Ohio-1895, ¶ 14. " 'A person may not provoke an assault or voluntarily enter an encounter and then claim a right of self-defense.' " *Id.*, quoting *Elam* at ¶ 14. "[A] multitude of courts have found that a defendant is at fault in creating the situation giving rise to the affray * * * when he chooses to confront the victim, chooses to knowingly go to a place where the victim will be or refuses to move in a direction away from the victim, even when the defendant's action was otherwise completely lawful." *State v. Ellis*, 10th Dist. No. 11AP-939, 2012-Ohio-3586, ¶ 15.

{¶ 45} The second element of a self-defense/defense of another claim employs "a combined subjective and objective test." *State v. Thomas*, 77 Ohio St.3d 323, 330 (1997).

The trier of fact "first must consider the defendant's situation objectively, that is, whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack, []he *reasonably* believed []he was in imminent danger." (Emphasis sic.)  *Id.*  "Then, if the objective standard is met, the [trier of fact] must determine if, subjectively, this particular defendant had an *honest* belief that []he was in imminent danger." (Emphasis sic.)  *Id*. at 331.

{¶ 46}  One component of the second element entails a showing that " 'the defendant must have used only that force reasonably necessary to repel the attack.  That is, he must not have used excessive force.' "  *Jamii* at ¶ 77, quoting *State v. Hall*, 10th Dist. No. 21AP-137, 2023-Ohio-837, ¶ 41, citing *State v. Kean*, 10th Dist. No. 17AP-427, 2019-Ohio-1171, ¶ 58.  Further, "[i]mplicit in the 'second element of self-defense, i.e., that the defendant's use of deadly force was in "good faith," is the requirement that the degree of force used was "warranted" under the circumstances and "proportionate" to the perceived threat.' "  *Kean* at ¶ 58, quoting *State v. Hendrickson*, 4th Dist. No. 08CA12, 2009-Ohio-4416, ¶ 31.  "Thus, ' "[i]f * * * the amount of force used is so disproportionate that it shows an 'unreasonable purpose to injure,' the defense of self-defense is unavailable." ' "  *Id*. at ¶ 58, quoting *State v. Bundy*, 4th Dist. No. 11CA818, 2012-Ohio-3934, ¶ 55, quoting *State v. Macklin*, 8th Dist. No. 94482, 2011-Ohio-87, ¶ 27, quoting *State v. Speakman*, 4th Dist. No. 00CA035 (Mar. 27, 2001).

{¶ 47}  As to the third element of a self-defense/defense of another claim, i.e., the "duty to retreat" requirement, we note that effective April 6, 2021, the General Assembly amended R.C. 2901.09 as to that element.  R.C. 2901.09(B) provides in relevant part: "For purposes of any section of the Revised Code that sets forth a criminal offense, a person has no duty to retreat before using force in self-defense [or] defense of another * * * if that person is in a place in which the person lawfully has a right to be."  R.C. 2901.09(C) further provides that "[a] trier of fact shall not consider the possibility of retreat as a factor in determining whether or not a person who used force in self-defense [or] defense of another

* * * reasonably believed that the force was necessary to prevent injury, loss, or risk to life or safety."[10]

{¶ 48} Here, the offense occurred on June 10, 2018 and the jury trial commenced on November 14, 2022. As already noted, the amendments to R.C. 2901.09 were effective April 6, 2021. Thus, the statute was amended after the offense was committed but prior to the commencement of trial. On November 15, 2022, the state filed a memorandum of law opposing retroactive application of R.C. 2901.09 as amended. The trial court and the parties addressed the issue during discussion of the jury instructions. Reiterating its argument opposing retroactive application of R.C. 2901.09 as amended, the state requested a jury instruction that appellant had a duty to retreat. Defense counsel argued that the amended version of R.C. 2901.09 should be applied retroactively and requested an instruction that appellant had no duty to retreat. Noting that the retroactivity question is "still under review," the trial court opined that the amended version of R.C. 2901.09 should be applied retroactively; in accordance with that finding, the court instructed the jury that appellant had no duty to retreat. (Tr. Vol. III at 6.)[11] Accordingly, the parties focus on the first two elements of a self-defense/defense of another claim.

{¶ 49} Before addressing appellant's specific arguments pertaining to his self-defense/defense of another claim, we note that " ' "[a] self-defense [or defense of another] claim is generally an issue of credibility." ' " *Jamii* at ¶ 78, quoting *State v. Lawrence*, 11th Dist. No. 2022-L-110, 2023-Ohio-3419, ¶ 41, quoting *State v. Olsen*, 11th Dist. No. 2022-A-0071, 2023-Ohio-2254, ¶ 57. " ' "Disputes in credibility for the purposes of evaluating self-

---

[10] The effect of the 2021 amendment to R.C. 2901.09, which is now widely referred to as the "stand your ground" law, is to expand the "no duty to retreat" exception from the person's residence or vehicle to any place where the person is lawfully entitled to be. *State v. Estelle*, 3d Dist. No. 1-20-50, 2021-Ohio-2636, ¶ 21, fn. 5.

[11] We note this court referenced the retroactivity issue in a footnote appearing in *State v. Huish*, 10th Dist. No. 21AP-255, 2023-Ohio-365, a case where the defendant both committed and was convicted of a criminal offense prior to the effective date of amended R.C. 2901.09. There, we agreed with the conclusion reached by the First District Court of Appeals in *State v. Parker*, 1st Dist. No. C-210440, 2022-Ohio-3831, that there is no language in R.C. 2901.09 suggesting that the General Assembly intended the statute to be applied retroactively. *Huish* at ¶ 63, fn. 8. We further note there is pending litigation in the Supreme Court of Ohio regarding the retroactivity issue. *See State v. Degahson*, 168 Ohio St.3d 1479, 2022-Ohio-4617; *State v. Duncan*, 169 Ohio St.3d 1430, 2023-Ohio-381; *State v. Terry,* 171 Ohio St.3d 1475, 2023-Ohio-3789. Finally, we note the state did not file a motion for leave to cross-appeal the trial court's "no duty to retreat" jury instruction, presumably because appellant was convicted of the offense. The state makes only a passing reference to the retroactivity issue in its brief: "Despite the fact that the offense occurred in 2018, the trial court provided jury instructions that were consistent with the self-defense law as it existed in 2022, the date of the trial, which included the 'stand your ground' part of the law." (State's Brief at 9.)

defense [or defense of another] are best resolved by the trier of fact." ' " *Id.*, quoting *Lawrence* at ¶ 41, quoting *State v. Bentley*, 11th Dist. No. 2022-L-076, 2023-Ohio-1792, ¶ 24. " ' "It has been held that 'a conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version' and rejected the defendant's claim of self-defense [or defense of another]." ' " *Id.*, quoting *Lawrence* at ¶ 41, quoting *Bentley* at ¶ 24, quoting *State v. Messenger*, 10th Dist. No. 19AP-879, 2021-Ohio-2044, ¶ 49. " 'When weighing witness testimony supporting a claim of self-defense [or defense of another], the trier of fact is "free to believe or disbelieve the testimony of the witnesses" and "is in the best position to take into account inconsistences, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible." ' " *Id.*, quoting *Lawrence* at ¶ 41, quoting *Bentley* at ¶ 24, citing *State v. Haney*, 11th Dist. No. 2012-L-098, 2013-Ohio-2823, ¶ 43.

{¶ 50} Appellant first contends the state did not disprove that he was not at fault in creating the situation giving rise to his use of deadly force against Edwards. Appellant maintains the undisputed evidence establishes that Edwards initially confronted him while he was sitting in his car, appellant moved his car down the street to avoid any confrontation with Edwards, and Edwards re-initiated the confrontation by approaching his car in a threatening manner after appellant moved it.

{¶ 51} The state counters that the evidence as to who initiated and/or re-initiated the confrontation between Edwards and appellant is in dispute. The state maintains Edwards, Thomas, and Gills Edwards all testified that appellant initiated the confrontation, and appellant was the only witness who testified that Edwards initiated it. As to re-initiation, the state highlights the testimony of Edwards, Thomas, and Garrett that appellant exited his car after parking in front of Garrett's house and invited Edwards to fight him.

{¶ 52} As to the initial encounter, Edwards testified that after he refused to bring appellant's daughter to him, an argument ensued, resulting in appellant's threat to shoot and kill Edwards. Thomas' testimony generally corroborated that provided by Edwards. Thomas averred that appellant became angry when Edwards refused appellant's request to see his daughter and appellant told his wife that he was going to shoot Edwards. Based on

that threat, Thomas thought appellant had a gun and warned Edwards accordingly. According to Thomas, Edwards never threatened appellant.

{¶ 53} Appellant testified to a different version of the initial encounter. According to appellant, Edwards began cursing at appellant and put his hand inside the car through the open driver's window. Appellant saw that Thomas had a gun under his shirt and heard him suggest to Edwards that the two shoot up appellant's car. Appellant then moved his car down the street to avoid a confrontation with Edwards.

{¶ 54} Regarding re-initiation of the confrontation, Edwards testified that after appellant moved his car down the street, he parked, got out of the car, exhibited a fighting posture, and invited Edwards to fight him. Edwards readily acknowledged on cross-examination that he engaged with appellant because he was upset and wanted to fight him. Thomas testified that appellant exited his car and yelled and cursed at Edwards. Garrett testified that after appellant parked his car in front of her house, he got out, stood in the middle of the street, and urged Edwards to come toward him.

{¶ 55} During his testimony, appellant averred that after the initial encounter with Edwards, he remained in the area only to ensure his daughter's safety. He further averred that after he drove away from Edwards' home and parked his car, he saw Thomas hand something to Edwards, after which Edwards ran toward appellant's car in a threatening manner.

{¶ 56} Given the conflicting testimony as to who initiated and/or re-initiated the confrontation between appellant and Edwards, the jury, as the trier of fact in this case, was best positioned to make determinations about credibility and weight of the testimony. *Huish* at ¶ 88, citing *Messenger*, 2021-Ohio-2044, ¶ 47, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. As to the initial encounter, the jury could have credited the testimony offered by Edwards and Thomas that appellant threatened to shoot Edwards if he did not allow him access to his daughter and discredited appellant's testimony that Thomas had a gun and suggested to Edwards that they shoot appellant. Similarly, as to re-initiation of the encounter, the jury could have credited the testimony provided by Edwards and Garrett that appellant stood outside his parked car and invited Edwards to fight him and discredited appellant's testimony that Edwards ran toward him in a threatening manner. Based on the state's evidence, the jury could have reasonably

concluded that appellant was at least partially at fault for creating the situation giving rise to the shooting of Edwards.

{¶ 57} Moreover, even if we were to agree with appellant that the state did not disprove that he was not at fault in creating the situation giving rise to the shooting of Edwards, we cannot find the jury clearly lost its way in finding the state disproved that appellant had a reasonable and honest belief that he or his family were in imminent danger of death or great bodily harm and the only means of escape from the danger was in the use of deadly force. As noted above, the state needed only disprove one of the elements of his self-defense/defense of another claim.

{¶ 58} Appellant argues he reasonably and honestly believed he and his family were in danger of death or great bodily harm and that the only means of escape from the danger was by shooting Edwards. In support of his argument, appellant relies on his own testimony that Thomas had a gun under his shirt and he observed Thomas hand Edwards what he believed to be that same gun moments before he saw Edwards reach toward his waist, presumably to retrieve the gun, as he ran toward him. Appellant asserts that "also present in [his] mind" was his prior altercation with Edwards during which he sustained serious physical injuries. (Appellant's Brief at 13.) Further, citing Thomas' admission that he owned multiple firearms, appellant challenges the credibility of Thomas' testimony that he was not carrying a gun on the day of the incident. Finally, appellant claims that his actions after the shooting, i.e., calling 911, remaining at the scene, and cooperating with law enforcement, "are indicative of a man who believed he needed to defend himself." (Appellant's Brief at 14.)

{¶ 59} The state counters the jury was free to disbelieve appellant's account of the incident, particularly with regard to his claim that Edwards obtained a gun from Thomas and then reached toward his waist (presumably to retrieve the gun) as he ran toward appellant's car. The state notes the testimony provided by Edwards, Thomas, and Gills Edwards that neither Thomas nor Edwards had a gun at any point prior to the shooting. In addition, the state particularly notes the testimony of Garrett, a neutral witness without familial ties to Edwards, that she did not see a gun on Edwards' person when he approached appellant.

{¶ 60} Under the facts presented at trial, it was within the province of the jury to credit the testimonies offered by the state's witnesses that Edwards did not have a gun during his encounter with appellant and thus conclude that appellant did not have reasonable grounds for believing there was an imminent threat of death or serious bodily harm. Consequently, the weight of the evidence presented reflects appellant used deadly force when he was not faced with deadly force and the degree of force used by appellant was neither warranted under the circumstances nor proportionate to the perceived threat. *See Kean* at ¶ 58.

{¶ 61} Having reviewed the entire record, weighed the evidence and all reasonable inferences, and considered the credibility of witnesses, we conclude the jury did not lose its way and create a manifest miscarriage of justice when it found the state disproved beyond a reasonable doubt appellant's claim that he acted in self-defense or defense of another when he committed felonious assault against Edwards.

{¶ 62} Appellant's single assignment of error is overruled.

## IV. Conclusion

{¶ 63} Having overruled appellant's single assignment of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER & BOGGS, JJ., concur.

————————————