[Cite as *State v. Morgan*, 2024-Ohio-5843.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

JOHN EUGENE MORGAN,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 24 MA 0040**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2022 CR 00438

**BEFORE:**
Katelyn Dickey, Carol Ann Robb, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Gina DeGenova*, Mahoning County Prosecutor*,* and *Atty. Edward A. Czopur*, Assistant Prosecuting Attorney, for Plaintiff-Appellee and

*Atty. Brandon J. Henderson* and *Atty. Justin M. Weatherly*, Henderson & Weatherly Co., L.P.A., for Defendant-Appellant.

Dated: December 12, 2024

**DICKEY, J.**

{¶1} Appellant, John Eugene Morgan, appeals from the April 9, 2024 judgment of the Mahoning County Court of Common Pleas convicting him of felonious assault, and voluntary manslaughter and murder (merged), and sentencing him to a total of 18 years to life in prison following a jury trial. On appeal, Appellant asserts his convictions of voluntary manslaughter and murder are not supported by the manifest weight of the evidence. Appellant also alleges the jury instructions regarding the at fault component of self-defense were confusing and misleading thereby causing the jury to misapply the law. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

{¶2} On August 25, 2022, Appellant was indicted by the Mahoning County Grand Jury on three counts: count one, murder, an unclassified felony in violation of R.C. 2903.02(A), (D) and 2929.02(B); count two, murder, an unclassified felony in violation of R.C. 2903.02(B) (D), and 2929.02(B); and count three, felonious assault, a felony of the second degree in violation of R.C. 2903.11(A)(2) and (D)(1)(a). All three counts included three year firearm specifications pursuant to R.C. 2941.145(A). Appellant retained counsel, pled not guilty at his arraignment, and waived his right to a speedy trial.

{¶3} A jury trial commenced on February 20, 2024.

{¶4} There is no question that Appellant killed the victim, D.P., Sr. In fact, Appellant admitted that he killed D.P. when he shot him in the back. The only question presented at the jury trial was whether the killing was done in self-defense. After hearing all the testimony and viewing a dash-cam video of the incident, the jury did not believe Appellant's self-defense claim as presented.

{¶5} Kaitlynn Morgan testified for Appellee, the State of Ohio, that Appellant is her father and Mary Morgan is her mother. Although Appellant was legally married to Mary, Mary was D.P.'s girlfriend. Kaitlynn resided at D.P.'s home. On the day of the incident, July 31, 2022, Kaitlynn planned to go with her two-year-old son and Appellant to eat Sunday dinner at her brother's. Kaitlynn texted Appellant that she was ready for him to pick them up at D.P.'s house. D.P. and Mary became upset after finding out that Appellant was coming to their home, so Kaitlynn asked Appellant to pick her up on a

street corner a few houses away.  Appellant texted her back saying that he was going to D.P.'s house.

{¶6}    Kaitlynn did not immediately see Appellant's text message so she walked to the corner as planned.  When she saw Appellant's car heading towards D.P.'s house, Kaitlynn walked back towards D.P.'s house and saw Appellant turn into the driveway. She then saw D.P. come off of the porch towards Appellant before losing sight of the two men.  She heard a scuffle and eventually a gunshot.

{¶7}    D.P.'s son, D.P., Jr. ("Junior"), testified for the State that he witnessed his father being murdered by Appellant.  Junior was home at the time watching television when he heard a gunshot.  Junior ran outside and saw D.P. fighting with Appellant.  Junior jumped in to help D.P. because Appellant had a gun and was double his father's size. D.P. told Junior to go and Junior ran off.  The next thing Junior recalled was hearing his father say that he had been shot.

{¶8}    Mary testified for the State that although she was still legally married to Appellant, they had separated in 2019.  Their relationship was not good following the separation.  About a month or two before the incident, Mary recalled that Appellant was trying to get in touch with her.  Mary neither accepted Appellant's call nor returned his text messages.  D.P. learned that someone was trying to contact Mary and asked her if he could call the person back.  Mary consented and was present during the call in which both D.P. and Appellant threatened each other.  Appellant told Mary and D.P. that he was going to beat up D.P.

{¶9}    Regarding the day of the incident, Mary testified that Kaitlynn informed her and D.P. that Appellant was coming to pick her up.  Mary and D.P. became angry because neither of them wanted Appellant at the house.  Appellant had a short fuse and Mary was concerned about what he might do to D.P.  Thus, Kaitlynn made arrangements to meet Appellant a few houses down the street at a nearby corner.

{¶10} Mary went in the house while D.P. was on the porch.  She heard a tire squeal and D.P. using an expletive that Appellant brought a gun.  Mary then heard a single gunshot. She saw Appellant with a gun and ran outside.  Mary saw D.P. and Junior running.  She then saw Appellant point the gun at D.P.'s back and shoot D.P. in the back. Appellant told Mary that it was all her fault.  Mary ran over to D.P., who had dropped to

his knees, and she began praying. She started CPR and called 911. (State's Exhibit 58). D.P.'s autopsy confirmed Mary's observations, i.e., that D.P. was shot once in the back with the bullet going through his body before exiting through his chest.

{¶11} Officer David Hilliard with the Youngstown Police Department ("YPD") testified for the State that he was the first officer to arrive at the scene. He found Appellant with his hands in the air and a holster strapped to his waistband.

{¶12} Officer Robert Giovanni with the YPD testified for the State that when he arrived, he found D.P. on his back with a gunshot wound to his torso. He could immediately tell that D.P., although alive at the moment, was not going to survive.

{¶13} Detective Anthony Vitullo with the YPD testified for the State that he was assigned as the lead detective in this case. As part of his investigation, he conducted an interview with Appellant. They discussed the telephone call Appellant had with D.P. prior to the incident. Appellant told the detective that it was fun messing with D.P. by getting him more and more angry. Appellant also told D.P. that he and Mary were still engaged in a sexual relationship. Appellant acknowledged that Kaitlynn asked him to pick her up on the corner. Appellant refused to do so and was determined to go to D.P.'s house.

{¶14} Appellant told Detective Vitullo that D.P. ran off the porch when he saw him pull in the driveway which made Appellant get out of his car and draw his gun. Appellant claimed the gun went off on its own before D.P. punched him. Appellant indicated he was on the ground and getting beaten up when he noticed the gun on the ground. Appellant then rolled over, grabbed the gun, and shot D.P. Appellant confirmed he was attempting to shoot D.P. Appellant further said the gun jammed as he was attempting to fire additional shots.

{¶15} During the interview, Detective Vitullo did not notice any serious injuries on Appellant, only some minor redness. Appellant did not ask for any medical treatment. The detective also spoke about recorded calls Appellant made while in jail. During one of the calls, Appellant admitted he was wrong for shooting D.P. and was not sure if he was being beaten up when he shot him.

{¶16} Finally, Detective Vitullo revealed that he seized, pursuant to a search warrant, a dash-cam video from Appellant's car which recorded the incident. The detective reviewed the video which was played for the jury and viewed by this court.

Case No. 24 MA 0040

(State's Exhibit 61). The video shows that although Kaitlynn and her son were waiting for Appellant on the corner, Appellant did not drive to them but instead pulled into D.P.'s driveway. D.P. came off his porch and said something to Appellant. Appellant got out of his car holding a handgun. Appellant fired a single shot into the ground near D.P.'s feet. This caused D.P. to turn his back to Appellant who then struck D.P. in the head with the gun before jumping on D.P.'s back.

{¶17} Appellant and D.P. fell to the ground and began fighting. Junior ran from the house and joined in, attempting to help his father. Junior then ran off, presumably at D.P.'s instruction. Appellant regained possession of the gun and D.P. began running away. D.P. was able to get two or more car lengths away from Appellant before Appellant took a knee, aimed, and shot and killed D.P. in the back. As indicated by Appellant during his interview with police, Appellant took aim again and attempted to fire additional rounds into D.P.'s back but the gun did not go off.

{¶18} At the conclusion of the State's case, Appellant moved for an acquittal pursuant to Crim.R. 29 which was overruled by the trial court.

{¶19} William Granger testified for the defense that he was raised by Appellant and Mary. William claimed Appellant had previously been involved in an incident where his car was shot at but Appellant was not hit. After that incident, Appellant regularly carried a gun. William believed it was usual for Kaitlynn to be picked up by Appellant and brought to his home on Sundays. However, after the phone call between Appellant and D.P. before the shooting, Kaitlynn began making excuses and did not want to come over as much. William confirmed he was not present during the incident at issue and could not speak with regard to any of the events.

{¶20} Lisa Markijohn, William's fiancé, testified for the defense. Like William, she too was not present during the incident and could not speak with regard to any of the events.

{¶21} Megan Owens, Appellant's girlfriend, testified for the defense. Like William and Lisa, she too was not present during the incident and could not speak with regard to any of the events.

{¶22} Timothy Dimoff, founder and owner of SACS Consulting, Investigative and Security Services, testified for the defense as a paid expert. He believed that video

footage cannot generally interpret feelings. He testified that a warning gunshot is a nice way of telling someone to stay back. He opined that Appellant engaged in a reasonable use of force when he shot and killed D.P. On cross-examination, Timothy acknowledged he did not speak with any of the police officers involved in this case, did not speak with the detective, did not speak with the 911 dispatcher, did not speak with the prosecutors, did not speak with Kaitlynn, did not speak with Junior, did not speak with Mary, did not speak with any neighbors, and did not go to the crime scene.

{¶23} Finally, Appellant testified. He went through his medical history which includes heart issues, stroke, high blood pressure, anxiety, and back problems. He claimed he had no prior issue with D.P. Appellant believed Mary should have known better than to meet D.P. in a bar and start a relationship with him. Appellant recalled telling D.P. they were boyfriend-in-laws because they were both sleeping with the same woman. Appellant admitted threatening D.P. during their telephone conversation.

{¶24} On the day of the incident, Appellant wanted to pick up Kaitlynn from D.P.'s house, despite her request to be picked up on the corner. Appellant's dash-cam video shows Kaitlynn and her son near the corner far away from D.P.'s house as Appellant was driving. Appellant claimed he did not see them waiting for him on the corner.

{¶25} Appellant proceeded towards D.P.'s house and immediately noticed D.P. on the front porch even before Appellant pulled in the driveway. Appellant got out of his car, brandished a firearm, and fired a warning shot into the ground near D.P.'s feet. This caused D.P. to turn his back to Appellant. Because the warning shot did not cause D.P. to flee, Appellant knew they would start to fight and Appellant swung at him. Appellant said lethal force was not required as D.P. had no weapon. D.P. turned away from Appellant causing Appellant to feel that he had the advantage. Appellant jumped on D.P.'s back in an attempt to crush him to the ground.

{¶26} Appellant said Junior came outside and joined in the fight. Appellant claimed he was struck by both D.P. and Junior which made him see stars and become confused. Appellant said he fell on his gun, grabbed it, got up, and shot D.P. Appellant called 911. (State's Exhibit 59). Appellant waited for police to arrive. He was then arrested and taken to the station.

{¶27} On cross-examination, Appellant admitted he could have pulled his car out of the driveway when he saw D.P., believing D.P. was aggressive, but he did not. Appellant admitted that before he hit D.P., he first pointed the gun at him. Appellant clarified that when he was pointing the gun at D.P., just before killing him, he saw D.P.'s back. Appellant admitted that when he pulled the trigger, D.P. did not pose any threat to him. Appellant further admitted that after shooting D.P. in the back, he retook his aim but claimed he did not attempt further shots despite what he told police officers earlier.

{¶28} Appellant renewed his motion for acquittal which was overruled by the trial court.

{¶29} The parties discussed the proposed jury instructions. The State wanted to use the Ohio Jury Instructions ("OJI") while defense counsel proposed to change the instructions regarding self-defense. The trial court agreed with the State and used the OJI.

{¶30} Following the jury trial, on February 28, 2024, regarding count one, Appellant was found guilty of a lesser included offense of voluntary manslaughter including the three-year firearm specification. Regarding counts two and three, Appellant was found guilty of murder and felonious assault including the three-year firearm specifications.

{¶31} After the verdict was announced, certain jury members in the jury room informed defense counsel that they misunderstood the law. The jurors believed the instructions they received were confusing and misleading. The jurors further believed that had they correctly understood the law, they would have found that Appellant acted in self-defense.

{¶32} In light of this information, Appellant filed a motion for leave to file a motion for new trial and a motion for new trial pursuant to Crim.R. 33 on March 28, 2024. Appellant alleged the jury instructions were misleading and confusing thereby depriving him of his right to a fair trial. Appellant attached two jurors' affidavits indicating how the jury instructions had confused them on the applicable law regarding the at fault component of self-defense. (Exhibits B and C).

{¶33} On April 2, 2024, the State filed an opposition maintaining Appellant's motion is untimely, does not conform to Crim.R. 33, and is barred by the aliunde rule.

Case No. 24 MA 0040

{¶34} On April 3, 2024, the trial court denied Appellant's motion for leave to file a motion for new trial, stating:

Criminal Rule 33 provides for a new trial to be granted upon motion when one of six issues occur. Furthermore the rule dictates that the motion should be filed within fourteen days of when the verdict was rendered. Defendant asserts that he should be granted leave past the fourteen day requirement because the Defendant was unavoidably prevented from filing said motion. Defendant's unavailability was caused by Defendant overdosing in the Mahoning County Justice Center after the verdict was read.

The Court received the verdict on February 28, 2024. After overdosing, being taken to the hospital, and refusing medical treatment the Defendant was released from the hospital and booked into the Justice Center on March 7, 2024. The Court finds that only 8 days passed, thus Defendant was not unavailable. Additionally, the Defendant did not sign an affidavit nor was he present to witness the allegations made in the motion and therefore his availability is moot.

Furthermore, Defendant's Motion fails to reference any of the six grounds outlined in Criminal Rule 33. There was no error of law that occurred. The misdirection of the jurors alleged in the motion is not possible since the jurors asked, in writing, numerous questions and at times wanted clarification. The jurors each had their own copy of the jury charge which contained the legal definition of self-defense.

Finally, the affidavits attached to the Motion are juror testimony which is prohibited by Evidence Rule 606.

Based upon the foregoing, Defendant's Motion is _overruled_.

(Emphasis sic.) (4/3/2024 Judgment Entry).

{¶35} On April 9, 2024, the trial court merged counts one and two and sentenced Appellant to a total of 18 years to life in prison. The court granted Appellant 47 days of jail-time credit and notified him that his sentence includes a mandatory period of post-release control of five years.

{¶36} Appellant filed a timely appeal and raises two assignments of error.

## ASSIGNMENT OF ERROR NO. 1

**WHETHER THE WEIGHT OF THE EVIDENCE SUPPORTS DEFENDANT'S CONVICTION OF VOLUNTARY MANSLAUGHTER AND FELONY MURDER.**

{¶37} In his first assignment of error, Appellant asserts his convictions of voluntary manslaughter and murder (merged) are against the manifest weight of the evidence. Appellant summarizes his argument as follows:

> The manifest weight of the evidence supports [Appellant's] claim that he acted in self defense when shooting [D.P.]. The dash cam recording of the incident clearly shows that even if the jury believed that [Appellant] was the initial aggressor, [D.P.] and [Junior] escalated the situation when they teamed up to physically assault [Appellant], leaving him disoriented and seeing stars. [Appellant] reasonably feared for his life and fired his gun to protect himself and make the beating stop. Therefore, the jury lost its way when it found [Appellant] guilty of voluntary manslaughter and felony murder.

(8/16/2024 Appellant's Brief, p. 6).

{¶38} For self-defense claims, appellate courts conduct a manifest weight analysis to determine whether the State has met its burden of persuasion. *State v. Messenger*, 2022-Ohio-4562, ¶ 26.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an Appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility

of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119. . . .

The weight to be given to the evidence and the credibility of the witnesses are nonetheless issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." D*avis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997).

*State v. T.D.J.*, 2018-Ohio-2766, ¶ 47-48 (7th Dist.).

**{¶39}** "'(C)ircumstantial evidence and direct evidence inherently possess the same probative value.'" *State v. Biros*, 78 Ohio St.3d 426, 447 (1997), quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus.

For an effective self-defense claim, a defendant must establish that: "(1) the defendant was not at fault in creating the situation that gave rise to the affray; (2) the defendant had a bona fide belief that [he] was in imminent danger of death or great bodily harm and that [his] only means of escape from such a danger was in the use of such force, and (3) the defendant did not violate any duty to retreat or avoid the danger." *State v. McDonald*, 2023-Ohio-1987, ¶ 17 (1st Dist.), quoting *State v. Wilson*, 2022-Ohio-3801, ¶ 10 (1st Dist.), quoting *State v. Smith*, 2020-Ohio-4976, ¶ 48 (1st Dist.). All three elements must be present; otherwise a defendant's self-defense claim fails. *State v. Smith*, 2020-Ohio-4976, ¶ 48 (1st Dist.), citing *State v. Cassano*, 96 Ohio St.3d 94, 107 (2002).

*State v. Griffin*, 2024-Ohio-4806, ¶ 20 (1st Dist.).

**{¶40}** "Where evidence is presented that tends to support that a defendant acted in self-defense, the State bears the ultimate burden in proving beyond a reasonable doubt

that the defendant's conduct was not in self-defense." *Griffin* at ¶ 21. This obligation has been codified in R.C. 2901.05 which states in part:

> A person is allowed to act in self-defense . . . . If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense . . ., the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense . . . .

R.C. 2901.05(B)(1).

> "'A self-defense claim is generally an issue of credibility.'" *State v. Lawrence*, 11th Dist. No. 2022-L-110, 2023-Ohio-3419, ¶ 41, quoting *State v. Olsen*, 11th Dist. No. 2022-A-0071, 2023-Ohio-2254, ¶ 57. "'Disputes in credibility for the purposes of evaluating self-defense are best resolved by the trier of fact.'" *Id.*, quoting *State v. Bentley*, 11th Dist. No. 2022-L-076, 218 N.E.3d 989, 2023-Ohio-1792, ¶ 24. "'It has been held that "a conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version" and rejected the defendant's claim of self-defense.'" *Id.*, quoting *Bentley* at ¶ 24, quoting *Messenger*, 2021-Ohio-2044, at ¶ 49, 174 N.E.3d 425.

*State v. Jamii*, 2023-Ohio-4671, ¶ 78 (10th Dist.).

{¶41} As applied here, Appellant's convictions of voluntary manslaughter and murder (merged) are not against the manifest weight of the evidence. Although the State only needed to disprove any one of the three elements of Appellant's self-defense claim beyond a reasonable doubt, all three elements were disproven as revealed in the record.

> Regarding the first element of a self-defense/defense of another claim, the concept that an accused must not be at fault in creating the situation giving rising to the situation "'is broader than simply not being the immediate aggressor.'" *State v. Bender*, 3d Dist. No. 14-23-12, 2024-Ohio-1750, ¶ 27, quoting *State v. Elam*, 12th Dist. No. CA2021-08-106, 2022-

Ohio-1895, ¶ 14. "'A person may not provoke an assault or voluntarily enter an encounter and then claim a right of self-defense.'" *Id.*, quoting *Elam* at ¶ 14. "[A] multitude of courts have found that a defendant is at fault in creating the situation giving rise to the affray * * * when he chooses to confront the victim, chooses to knowingly go to a place where the victim will be or refuses to move in a direction away from the victim, even when the defendant's action was otherwise completely lawful." *State v. Ellis*, 10th Dist. No. 11AP-939, 2012-Ohio-3586, ¶ 15.

The second element of a self-defense/defense of another claim employs "a combined subjective and objective test." *State v. Thomas*, 77 Ohio St.3d 323, 330 (1997). The trier of fact "first must consider the defendant's situation objectively, that is, whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack, [ ]he *reasonably* believed [ ]he was in imminent danger." (Emphasis sic.) *Id.* "Then, if the objective standard is met, the (trier of fact) must determine if, subjectively, this particular defendant had an *honest* belief that [ ]he was in imminent danger." (Emphasis sic.) *Id.* at 331.

One component of the second element entails a showing that "'the defendant must have used only that force reasonably necessary to repel the attack. That is, he must not have used excessive force.'" *Jamii* at ¶ 77, quoting *State v. Hall*, 10th Dist. No. 21AP-137, 2023-Ohio-837, ¶ 41, citing *State v. Kean*, 10th Dist. No. 17AP-427, 2019-Ohio-1171, ¶ 58. Further, "[i]mplicit in the 'second element of self-defense, i.e., that the defendant's use of deadly force was in "good faith," is the requirement that the degree of force used was "warranted" under the circumstances and "proportionate" to the perceived threat.'" *Kean* at ¶ 58, quoting *State v. Hendrickson*, 4th Dist. No. 08CA12, 2009-Ohio-4416, ¶ 31. "Thus, '"[i]f * * * the amount of force used is so disproportionate that it shows an 'unreasonable purpose to injure,' the defense of self-defense is unavailable."'" *Id.* at ¶ 58, quoting

*State v. Bundy*, 4th Dist. No. 11CA818, 2012-Ohio-3934, ¶ 55, quoting *State v. Macklin*, 8th Dist. No. 94482, 2011-Ohio-87, ¶ 27, quoting *State v. Speakman*, 4th Dist. No. 00CA035 (Mar. 27, 2001).

As to the third element of a self-defense/defense of another claim, i.e., the "duty to retreat" requirement, . . . effective April 6, 2021, the General Assembly amended R.C. 2901.09 as to that element. R.C. 2901.09(B) provides in relevant part: "For purposes of any section of the Revised Code that sets forth a criminal offense, a person has no duty to retreat before using force in self-defense [or] defense of another * * * if that person is in a place in which the person lawfully has a right to be." R.C. 2901.09(C) further provides that "[a] trier of fact shall not consider the possibility of retreat as a factor in determining whether or not a person who used force in self-defense [or] defense of another * * * reasonably believed that the force was necessary to prevent injury, loss, or risk to life or safety."

*State v. Cumberlander*, 2024-Ohio-2431, ¶ 44-47 (10th Dist.).

**{¶42}** Appellant's position that he acted in self-defense belies the record in this case. Appellant voluntarily entered into the encounter by going to D.P.'s house and remaining where he was not permitted to be. Appellant was the initial aggressor and began the physical altercation by firing a warning shot before striking the first blow. The record reveals Appellant violated his duty to retreat. Appellant fired a gunshot into D.P.'s back when any imminent threat to Appellant had already ended.

**{¶43}** Regarding the first element, Appellant was at fault for creating the situation giving rise to the affray. The testimony from the jury trial and the dash-cam video from Appellant's car establish the following: Kaitlynn texted Appellant there was a problem and that he should not go to D.P.'s house; Appellant disregarded Kaitlynn's text message and went to D.P.'s house anyway; Appellant did not drive to Kaitlynn and her son, who were waiting for Appellant to pick them up on the street corner; Appellant saw D.P. on his front porch; Appellant pulled into D.P.'s driveway; Appellant could have reversed his car out of the driveway when he saw D.P. come towards his car, but he did not; Appellant got out of his car, brandished his gun, and fired a warning shot into the ground near D.P.'s feet;

a brief physical altercation ensued; D.P. turned his back and ran a couple car lengths away from Appellant; nevertheless, Appellant pointed his gun at the back of D.P. and shot and killed him.

{¶44} Based on the facts presented, Appellant's claim of self-defense was properly rejected. Because the trial court's finding that Appellant was at fault for the affray was not against the manifest weight of the evidence, the State disproved the first element of self-defense. Although we need not consider Appellant's arguments on the remaining elements, we will nevertheless address them briefly. *See Griffin*, 2024-Ohio-4806, at ¶ 26 (1st Dist.).

{¶45} Regarding the second element, Appellant did not have a bona fide belief that he was in imminent danger of death or great bodily harm at the time that he killed D.P. by shooting him in the back as D.P. was running away. In fact, Appellant admitted at the jury trial that D.P. did not pose any imminent threat to him and Appellant was not in any danger at the time he shot D.P. in the back and killed him. During his interview with police, Appellant said he retook his aim and attempted to fire additional shots into D.P. but his gun would not fire. Any claim by Appellant that he was in a daze as a result of being punched is dispelled by the evidence and such argument has been rejected by this court in a similar factual scenario. *See, e.g., State v. Italiano*, 2021-Ohio-1283 (7th Dist.). Minus some redness on Appellant's face and some scrapes on his knees, the police saw no signs of physical injury to Appellant when they interviewed him immediately after the incident. In addition, Appellant rejected the officers' offer for medical treatment.

{¶46} Based on the foregoing, the State disproved, and Appellant admitted, that he was not under any imminent threat at the time of the shooting. Appellant's claim of self-defense fails as to the second element as well.

{¶47} Regarding the third and final element, Appellant maintains the State did not specifically present the duty to retreat argument below. However, the facts presented and the record from the jury trial reveal Appellant was not in a place that he was lawfully permitted to be when he shot and killed D.P. The testimony establishes Appellant had no legal right to be at D.P.'s house on the day of the incident and, in fact, was specifically instructed not to go there. Appellant admitted that Kaitlynn informed him there was a problem and that he should not go to D.P.'s house. Any invitation by Kaitlynn was revoked

via her text message to Appellant. Nevertheless, Appellant chose to go to D.P.'s and remain on D.P.'s property to instigate an affray that ended when he shot D.P. in the back as D.P. was running away from him.

{¶48} Based on the foregoing, the record reveals Appellant violated his duty to retreat or avoid the danger. Appellant's claim of self-defense fails as to the third element as well.

{¶49} Lastly, Appellant claims that D.P. and Junior escalated the situation when Junior entered the affray to help his father. Appellant believes this somehow justified him shooting D.P. in the back as D.P. was running away from him and after Junior had already fled the scene. In support of his escalation argument, Appellant cites to *State v. Hendrickson*, 2009-Ohio-4416 (4th Dist.). However, *Hendrickson* neither specifically mentions escalation nor supports Appellant's position.

{¶50} Rather, as addressed, once a threat has been removed, a person's right to self-defense has ended. Here, any claimed right of self-defense ended when D.P. began running away from Appellant. Even assuming arguendo that Appellant is correct concerning his escalation argument and was somehow not at fault for creating the situation giving rise to the affray, self-defense was still not available to him because there was no imminent threat to Appellant at the time of the shooting and he was not in a place that he was legally permitted to be.

{¶51} In addition to Appellant's admission that he shot D.P. in the back and the dash-cam video showing the incident in its entirety, the jury chose to believe the State's witnesses. *DeHass,* 10 Ohio St.2d at paragraph one of the syllabus. Based on the evidence presented, as previously stated, the jury did not clearly lose its way in finding Appellant guilty of voluntary manslaughter and murder (merged). *Thompkins,* 78 Ohio St.3d at 387.

{¶52} Appellant's first assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 2

**WHETHER THE JURY INSTRUCTIONS REGARDING THE AT FAULT COMPONENT OF SELF-DEFENSE WERE CONFUSING AND MISLEADING SO AS TO LEAD THE JURY TO MISAPPLY THE LAW.**

{¶53} In his second assignment of error, Appellant takes issue with the jury instructions with respect to the at fault component of self-defense. Appellant summarizes his argument as follows:

> [T]he jury instructions provided by the trial court regarding self-defense were confusing and misled the jury to misapply the law. The jury instructions suggested that [Appellant] had lost his right to self-defense even though [D.P.] and [Junior] had escalated the situation. As such, [Appellant's] conviction should be reversed and a new trial should be ordered.

(8/16/2024 Appellant's Brief, p. 6).

{¶54} Appellant admits he did not object to the jury instructions at trial and admits the jury instructions that were given were a correct statement of the law. Nevertheless, Appellant believes the jury instructions misled the jury.

> Jury instructions are generally left to the discretion of the trial court, and thus, we ordinarily apply the abuse of discretion standard when reviewing a decision not to instruct the jury in a certain manner. *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989); *State v. Cain*, 10th Dist. Franklin No. 06AP-1252, 2007-Ohio-6181, ¶ 7. . . . [H]owever, [if] there was no objection to the jury instruction that [the] Appellant challenges on appeal, . . . he waived all but plain error.

> Crim.R. 30(A) states "a party may not assign as error (on appeal) the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict * * *." However, appellate courts may notice "[p]lain errors or defects affecting substantial rights * * * although they were not brought to the attention of the (trial) court." Crim. R. 52(B).

> Appellate courts should notice plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. Plain error is an obvious deviation

from a legal rule that affects the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). The appellant must show the outcome would have been different absent the plain error. *Id.*

*State v. Dorff*, 2023-Ohio-3424, ¶ 17-19 (7th Dist.).

{¶55} "'[R]equested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction.'" *State v. Knuff*, 2024-Ohio-902, ¶ 182, quoting *State v. Adams*, 2015-Ohio-3954, ¶ 240.

{¶56} The jury instructions given here were a correct statement of the law as they followed the OJI on self-defense.

. . . Ohio Jury instructions ("OJI") are not a source of binding legal authority but "are helpful as an example of the generally accepted interpretation" of state law. *State v. Ferguson*, 10th Dist. Franklin No. 07AP-640, 2008-Ohio-3827, 2008 WL 2932005, ¶ 47, quoting *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶¶ 97 (Lanzinger, J., dissenting). . . . [A]dherence to the wording of OJI [is considered] to be of some significance in evaluating challenges to jury instructions. *State v. Frye*, 2018-Ohio-894, 108 N.E.3d 564, ¶ 107 (3d Dist.).

In examining a challenge to a jury instruction, "[t]he relevant principle [* * *] is not one of abstract correctness, but is whether an instruction—even if a correct statement of law—is potentially misleading." *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 52. Thus, an appellate court "must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights." *Frye* at ¶ 105, quoting *Becker v. Lake Cty. Mem. Hosp. W.*, 53 Ohio St.3d 202, 208, 560 N.E.2d 165 (1990). "An appellate court reviewing jury instructions must examine the specific charge at issue in the context of the entire charge, and not in isolation." *Orians* at ¶ 10.

*State v. Smith*, 2023-Ohio-3015, ¶ 46-47 (3d Dist.).

{¶57} The trial court properly followed the OJI and instructed the jury as to every element of self-defense, specifically stating:

Self-defense: The defendant is allowed to use deadly force in self-defense. Evidence was presented that could support a finding that the defendant used deadly force in self-defense. In order to prove that the defendant did not act in self-defense, the state must prove beyond a reasonable doubt at least one of the following:

The defendant was at fault in creating the situation giving rise to the shooting death of [D.P.]; or the defendant did not have reasonable grounds to believe and an honest belief, even if mistaken, that he was in imminent or immediate danger of death or great bodily harm; or the defendant did not use reasonable force.

At fault: The defendant did not act in self-defense if the state proved beyond a reasonable doubt that the defendant was at fault in creating the situation, incident or argument that resulted in the death of [D.P.]. The defendant was at fault when it is proven beyond a reasonable doubt that he was the initial aggressor, and the state proved beyond a reasonable doubt that [D.P.], and/or [Junior], did not escalate the situation, incident or argument to deadly force in self-defense; or the state proved beyond a reasonable doubt that the defendant provoked [D.P.], and/or [Junior], into using force.

Deadly force means any force that carries with it a substantial risk that it will proximately result in the death of a person.

Substantial risk means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist.

In deciding whether the defendant had reasonable grounds to believe and an honest belief that he was in imminent or immediate danger

the position of the defendant, with his characteristics, his knowledge or lack of knowledge, and under the circumstances and conditions that surrounded him at the time. You must consider the conduct of [D.P.], and/or [Junior], and decide his acts or words cause the defendant to reasonably and honestly believe that the defendant was about to be killed or receive great bodily harm.

(2/20/2024 Jury Trial Tr., p. 995-998).

{¶58} As addressed, Appellant's position that he acted in self-defense belies the record in this case. Appellant voluntarily entered into the encounter by going to D.P.'s house and remaining where he was not permitted to be. Appellant was the initial aggressor and began the physical altercation by firing a warning shot before striking the first blow. The record reveals Appellant violated his duty to retreat. Appellant fired a gunshot into D.P.'s back when any imminent threat to Appellant had already ended. Appellant was at fault for creating the situation giving rise to the affray. The testimony from the jury trial and the dash-cam video from Appellant's car establish the following: Appellant could have seen Kaitlynn and her son, who were waiting for Appellant to pick them up on the street corner; Appellant saw D.P. on his front porch; Appellant pulled into D.P.'s driveway; Appellant could have reversed his car out of the driveway when he saw D.P. come towards his car, but he did not; Appellant got out of his car, brandished his gun, and fired a warning shot into the ground near D.P.'s feet; a brief physical altercation ensued; D.P. turned his back and ran a couple car lengths away from Appellant; nevertheless, Appellant pointed his gun at the back of D.P. and shot and killed him.

{¶59} In addition, Appellant did not have a bona fide belief that he was in imminent danger of death or great bodily harm at the time that he killed D.P. by shooting him in the back as D.P. was running away. In fact, Appellant admitted at the jury trial that D.P. did not pose any imminent threat to him and Appellant was not in any danger at the time he shot D.P. in the back and killed him. During his interview with police, Appellant said he retook his aim and attempted to fire additional shots into D.P. but his gun would not fire.

{¶60} Furthermore, the record reveals Appellant was not in a place that he was lawfully permitted to be when he shot and killed D.P. The testimony from the jury trial

Case No. 24 MA 0040

shows Appellant had no legal right to be at D.P.'s house on the day of the incident and, in fact, was specifically instructed not to go there. Appellant admitted that Kaitlynn informed him there was a problem and that he should not go to D.P.'s house. Any invitation by Kaitlynn was revoked via her text message to Appellant. Nevertheless, Appellant chose to go to D.P.'s and remain on D.P.'s property to instigate an affray that ended when he shot D.P. in the back as D.P. was running away from him.

{¶61} Neither D.P. nor Junior had a weapon. The testimony and the dash-cam video reveal that at no time did D.P. and/or Junior escalate the situation to the level of deadly force. Even assuming arguendo that Appellant is correct concerning his escalation argument and that he was somehow not at fault for creating the situation giving rise to the affray, self-defense was still not available to him because there was no imminent threat to Appellant at the time of the shooting and he was not in a place that he was legally permitted to be. There is nothing misleading about the jury's instructions, which followed the OJI, as to self-defense.

{¶62} In *State v. Jordan*, 2009-Ohio-6152 (11th Dist.), our Sister court explained that the jury instructions given in that case followed the OJI and were, therefore, appropriate. The court held:

> As noted in the concurring opinion in the case of *State v. Jeffers,* 11th Dist. No.2007–L–011, 2008–Ohio–1894, "[t]he standard instructions found in Ohio Jury Instructions, commonly referred to as OJI, are not mandatory. Rather, they are recommended instructions, based primarily upon case law and statutes. The particular instruction to be given in a jury trial is fact specific and based upon the indictment, testimony, evidence, and defenses available to the defendant. The standard instructions are crafted by the Ohio Judicial Conference and sanctioned by the Ohio Supreme Court to assist trial judges and lawyers in correctly and efficiently charging the jury on the law applicable to a particular case. The OJI are authoritative, and are generally to be followed and applied by Ohio's courts. Cf. *State v. Kucharski,* 2d Dist. No. 20815, 2005–Ohio–6541, ¶ 25, fn. 1. The OJI are tested, both at trial and through thorough appellate and (usually) Supreme Court review. Standard criminal instructions are written under the particular

statutes and existing precedent from the Ohio Supreme Court. When given, they insure accuracy and compliance with constitutional protections afforded to litigants and minimize reversible error." *Id.* at ¶ 107.

*Jordan* at ¶ 40.

**{¶63}** *Jordan* also concerned a motion for new trial in which it was argued that the jurors were misled by the jury instructions and that if they were properly instructed, the result of the case would have been different. This is the exact position Appellant takes in the case at bar. Like Jordan, Appellant submitted two affidavits from jurors claiming they were misled by the jury instructions and that if they would have understood the law correctly, they would have found Appellant acted in self-defense as they believed D.P. and Junior had escalated the situation. These two affidavits were attached to Appellant's motion for leave to file a motion for new trial. (Exhibits B and C).

**{¶64}** Regarding juror affidavits, the court in *Jordan* explained:

Mr. Jordan, however, failed to introduce any "extraneous, firsthand, independent evidence" that would allow the court to consider the juror's affidavits. The only "evidence" Mr. Jordan submitted to support his proposition that Evid.R. 606(B), better known as the aliunde rule, should not apply, and thus, allow the court to consider the juror's affidavits, consisted of citations to cases where the Supreme Court of Ohio and other districts determined the Ohio Jury Instructions should not have applied in those circumstances. We disagree that simply citing to case law is the type of "extraneous, firsthand, independent evidence" contemplated by Evid.R. 606(B) that would permit the consideration of juror testimony to impeach a verdict.

The Supreme Court of Ohio explained this rule in *Schiebel:* "[i]n order to permit juror testimony to impeach a verdict, a foundation of extraneous, independent evidence must first be established. This foundation must consist of information other than the jurors themselves, *Wicker v. Cleveland* (1948), 150 Ohio St. 434, 83 N.E.2d 56, and *the information must be from a source which possesses firsthand knowledge of the improper conduct.*"

(Emphasis added.) *Id.* at 75, 83 N.E.2d 56. See, also, *State v. Powell,* 11th Dist. No.2008–L–116, 2009–Ohio–2821, fn. 1; *State v. Turner* (Nov. 2, 2001), 11 th Dist. No.2000–T–0074, 2001 Ohio App. LEXIS 4992, 20–21, 2001 WL 1388365 (a juror's testimony is not evidence aliunde).

In sum, the aliunde rule governs the competency of a juror to testify at a subsequent proceeding concerning the original verdict. And, quite simply, the cases he cites in support of his argument are not the type of "independent, firsthand knowledge" of improper conduct the aliunde rule requires to allow the consideration of information from the jurors themselves.

(Emphasis sic.) *Jordan*, 2009-Ohio-6152, at ¶ 44-46 (11th Dist.).

**{¶65}** Evid.R. 606(B) "establishes that jurors are generally incompetent to testify as to any matter directly attendant to the internal processes of the jury's deliberations." *State v. Perry*, 1997 WL 590789, *9 (11th Dist. Aug. 29, 1997). "The juror's affidavit may not be considered under Evid.R. 606(B) except for a limited purpose not relevant to the issue of defective jury instructions." *State v. Poindexter*, 1991 WL 30613, *6 (1st Dist. March 6, 1991).

**{¶66}** In a similar matter to the instant case dealing with Evid.R. 606(B), the Eighth District in *State v. Paige*, 1994 WL 78223, *4 (8th Dist. March 10, 1994) concluded:

. . . Paige presented the affidavit of Diane Zoldak who claimed that she misunderstood the court's instructions. According to Zoldak, the jury either misunderstood or ignored the court's instruction that an overt act in furtherance of the crime is necessary in order to convict a defendant as an aider and abettor. Zoldak's affidavit did not allege that the jury was influenced by any extraneous prejudicial information. She claims only that the jury misunderstood the instructions given by the trial court. The jury's understanding and application of the jury instructions is clearly a matter occurring during the course of the jury's deliberations which involves a juror's mental processes in connection with the verdict. Consequently, Evid.R. 606(B) prohibits Zoldak from testifying about the alleged

misunderstanding. Since Paige presented no other evidence which established grounds for a new trial, his motion was properly overruled. . . .

*Paige* at *4.

{¶67} Based on the foregoing, the two juror affidavits attached to Appellant's motion for leave to file a motion for new trial claiming they did not understand the jury instructions regarding the at fault component of self-defense are prohibited under *Jordan*, *Paige*, and Evid.R. 606(B). The jury instructions given in this case regarding self-defense were proper as they followed the OJI. Even assuming arguendo there was error in the escalation component of the instructions and even assuming that D.P. and/or Junior escalated the situation, Appellant's self-defense claim still fails. As addressed, although the State only needed to disprove any one of the three elements of Appellant's self-defense claim beyond a reasonable doubt, all three elements were disproven as revealed in the record. The State disproved, and Appellant admitted, that he was not under any imminent threat at the time of the shooting. Also, the facts presented and the record from the jury trial reveal Appellant was not in a place that he was lawfully permitted to be when he shot and killed D.P. We fail to find any plain error.

{¶68} Appellant's second assignment of error is without merit.

## CONCLUSION

{¶69} For the foregoing reasons, Appellant's assignments of error are not well-taken. The April 9, 2024 judgment of the Mahoning County Court of Common Pleas convicting Appellant of felonious assault, and voluntary manslaughter and murder (merged), and sentencing him to a total of 18 years to life in prison following a jury trial is affirmed.

Robb, P.J., concurs.

Hanni, J., concurs.

Case No. 24 MA 0040

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure.  It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**